**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

| | | |
|---|---|---|
| CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; and THE BAVARIAN FLOWER FARM, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 22 CV 3875 |
| -vs- | ) ) | **JURY TRIAL DEMANDED** |
| POSSIBILITY PLACE NURSERY, INC.; CONNOR B. SHAW, III; TRISTAN SHAW; KELSAY SHAW; SHAW FAMILY DEC TRUST; SHAW FAMILY TRUST; COUNTY OF WILL; WILL COUNTY LAND USE DEPARTMENT; TIM MACK, in his individual capacity; GREG RATAJCZAK, in his individual capacity; BRIAN RADNER, in his individual capacity; NICOLE ROEDL, in her individual capacity; SCOTT KILLINGER; BAXTER & WOODMAN, INC.; DONALD WAUTHIER; and BERNS, CLANCY AND ASSOCIATES, P.C., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## **COMPLAINT**

NOW COME Plaintiffs, CHICAGO TITLE LAND TRUST COMPANY, as

Successor Trustee for LaSalle Bank National Association, as Trustee under Trust

Agreement, dated 11/01/94, and known as Trust #119089; STEVEN W. BECKER,

THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title

Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as

Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; and THE

BAVARIAN FLOWER FARM, by their undersigned counsel, and complain against

POSSIBILITY PLACE NURSERY, INC.; CONNOR B. SHAW, III; TRISTAN SHAW;

KELSAY SHAW; SHAW FAMILY DEC TRUST; SHAW FAMILY TRUST;

COUNTY OF WILL; WILL COUNTY LAND USE DEPARTMENT; TIM MACK, in

his individual capacity; GREG RATAJCZAK, in his individual capacity; BRIAN

RADNER, in his individual capacity; NICOLE ROEDL, in her individual capacity;

SCOTT KILLINGER; BAXTER & WOODMAN, INC.; DONALD WAUTHIER; and

BERNS, CLANCY AND ASSOCIATES, P.C.  In support thereof, the Plaintiffs allege as

follows:

## PRELIMINARY STATEMENT

1.       This is a civil rights action brought pursuant to 42 U.S.C. § 1983, 42

U.S.C. § 1988, and Illinois state law to address deprivations under color of state law of

the Plaintiff's rights as secured by the Constitution of the United States and the law of the

State of Illinois.  The claims arise as a result of the recurrent flooding of Plaintiffs' real

property by an adjacent nursery that began in 2018 after the nursery conducted extensive

excavations in a pond and into an inventoried wetland located on its property and

continues to the present, which pattern of flooding is strikingly similar to that described

by the United States Supreme Court in its landmark Takings Clause decision in *Ark.*

*Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012), in that, in each instance, the

recurrent flooding over a series of years destroyed both mature trees and unique natural

2

habitat by altering the oxidation of the soil.

2.      In addition, the Will County Land Use Department maintains a policy, custom, or practice of ignoring wetland and water resource code violations committed by politically connected violators, such as the nursery's owner, who is a former Will County Board Member with extensive financial contracts with County entities and partners, and, further, the Department's policymaker ratified an employee's decision to delegate the authority to investigate the nursery's extensive violations to a paid engineer selected and hired by the violator himself, thereby depriving the Plaintiffs of any independent investigation by the county engineer and any input into the investigatory process, which practices have directly and proximately resulted in the deprivation of Plaintiffs' constitutional rights, the taking of their property, the denial of the use and enjoyment of their land, and extensive damages.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).  This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to the claims occurred in this district and all of the property that is the subject of this action is situated in this district.

## PARTIES

5.      Plaintiff CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089, owns a 20-acre parcel of land in Will County, Illinois, as trustee.

6. Plaintiffs STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089, are the beneficial owners.

7. Plaintiff THE BAVARIAN FLOWER FARM is owned and operated by Thomas J. Becker, with its principal place of business at 7600 W. Monee-Manhattan Road, Monee, Illinois, 60449, which is located in Will County, Illinois.

8. Defendant POSSIBILITY PLACE NURSERY, INC. (hereinafter "PPN") is an active domestic BCA corporation, domiciled in Illinois, with its principal place of business at 7528 and 7548 W. Monee-Manhattan Road, Monee, Illinois 60449, which are located in Will County, Illinois. PPN owns a 39-acre parcel of land in Will County, Illinois.

9. Defendant CONNOR B. SHAW, III (hereinafter "Connor Shaw") is President, Secretary, and an owner of PPN. He resides in the Northern District of Illinois.

10. Defendant TRISTAN SHAW, an owner of PPN, is the son of Connor Shaw, is in charge of PPN Field Operations, and is the nursery's self-described irrigation guru. Upon information and belief, he resides in the Northern District of Illinois.

11. Defendant KELSAY SHAW, an owner of PPN, is a son of Connor Shaw and is PPN's botanist. Upon information and belief, he resides in the Northern District of Illinois.

12. Defendant SHAW FAMILY DEC TRUST owns a 37-acre parcel of land in Will County, Illinois, as trustee. PPN operates upon land owned by Defendant SHAW

4

FAMILY DEC TRUST.

13.     Defendant SHAW FAMILY TRUST owns a 2-acre parcel of land in Will County, Illinois, as trustee.  PPN operates upon land owned by Defendant SHAW FAMILY TRUST.

14.     Defendant COUNTY OF WILL is organized under the laws of the State of Illinois and is located in the Northern District of Illinois.

15.     Defendant WILL COUNTY LAND USE DEPARTMENT is a political subdivision of the Defendant COUNTY OF WILL and is responsible for enforcing, investigating, and taking corrective action with respect to code violations pertaining to flooding, wetlands, stormwater, and tile water.

16.     Defendant TIM MACK is Defendant WILL COUNTY LAND USE DEPARTMENT'S Finance/Operations/Community Development Division Director, one of three Division Directors in the WILL COUNTY LAND USE DEPARTMENT, holds the second highest position in the WILL COUNTY LAND USE DEPARTMENT, and is the direct supervisor of Defendant GREG RATAJCZAK.  At all times relevant to this Complaint, MACK was employed by and acted within the scope of his employment as Division Director at the WILL COUNTY LAND USE DEPARTMENT and under color of state law.  In his role as Division Director, MACK was a final policymaker for the WILL COUNTY LAND USE DEPARTMENT.

17.     Defendant GREG RATAJCZAK is the Manager of Defendant WILL COUNTY LAND USE DEPARTMENT'S Code Enforcement Unit in its Community Development Division.   At all times relevant to this Complaint, RATAJCZAK was employed by and acted within the scope of his employment as Manager at the WILL

COUNTY LAND USE DEPARTMENT and under color of state law.

18. Defendant BRIAN RADNER is Defendant WILL COUNTY LAND USE
DEPARTMENT'S Development Services Division Director, one of three Division
Directors in the WILL COUNTY LAND USE DEPARTMENT, and holds the third
highest position in the WILL COUNTY LAND USE DEPARTMENT. He is the direct
supervisor of Defendant NICOLE ROEDL. At all times relevant to this Complaint,
RADNER was employed by and acted within the scope of his employment as Division
Director at the WILL COUNTY LAND USE DEPARTMENT and under color of state
law.

19. Defendant NICOLE ROEDL is an engineering technician in Defendant
WILL COUNTY LAND USE DEPARTMENT'S Development Services Division. At all
times relevant to this Complaint, ROEDL was employed by and acted within the scope of
her employment as an engineering technician at the WILL COUNTY LAND USE
DEPARTMENT and under color of state law.

20. Defendant SCOTT KILLINGER, is a professional engineer employed by
Defendant BAXTER & WOODMAN, INC., an independent contractor hired by
DEFENDANT COUNTY OF WILL, who currently holds the title of Chief Subdivision
Engineer for Will County. In his role as Chief Subdivision Engineer for Defendant
WILL COUNTY, he was acting under color of state law. On information and belief, he
resides in the Northern District of Illinois.

21. Defendant BAXTER & WOODMAN, INC., is an active domestic BCA
Corporation, domiciled in the State of Illinois, with its principal place of business at 8678
Ridgefield Road, Crystal Lake, Illinois 60012. BAXTER & WOODMAN, INC.,

maintains an office in Will County, Illinois.

22.     Defendant DONALD WAUTHIER is an agricultural engineer and the Vice President of Defendant BERNS, CLANCY AND ASSOCIATES, P.C. Wauthier does business in Will County, Illinois.

23.     Defendant BERNS, CLANCY AND ASSOCIATES, P.C., is an active domestic BCA Corporation, domiciled in the State of Illinois, with its principal place of business at 405 East Main Street, Urbana, Illinois 61802. BERNS, CLANCY AND ASSOCIATES, P.C., does business in Will County, Illinois.

## STATEMENT OF FACTS

**Historical Background**

24.     In 1957, Connor B. Shaw II, his wife, Marian (Betty) Shaw, and their family, including Defendant Connor Shaw, III, moved to Green Garden Township in Will County, Illinois to reside on a farm of approximately 80 acres.

25.     The farm is currently comprised of three parcels: a 37-acre parcel with homestead under the name of the Shaw Family Dec Trust (PIN #1813134000270000), a 39-acre parcel under the name of Possibility Place Nursery, Inc. (PIN #1813134000260000), and a 2-acre parcel under the name of the Shaw Family Trust (PIN #1813134000250000).

26.     At the time the Shaw family moved to the property, a wetland of approximately 5 acres in size was located at the western edge of the 80-acre parcel.

27.     The wetland was part of the historic stormwater drainage pattern of the SE Quadrant of Section 13.

28.     The stormwater pattern on the Shaw land flowed from the north, east and south into the 5-acre wetland.

7

29.     Defendant Connor Shaw's father, Connor B. Shaw, II, was a longstanding public official, who served on the Peotone 207-U School Board of Education in Will County, Illinois for 29 years, including 20 years as 207-U Board President.

30.     Connor B. Shaw, II, was also a member of the Park Forest Merchant's Association, a member of the Will/South Cook Soil & Water Conservation District, and had many ties to Will County officials and other influential government entities.

31.     The Will/South Cook Soil & Water Conservation District works together with the United States Department of Agriculture (USDA) and the Natural Resources Conservation Service (NRCS) to assist district residents conserve, develop, manage, and use land, water, and related sources.

32.      In 2002, some 8 years after Connor B. Shaw, II's passing, the former Peotone Junior High School was renamed the "Connor Shaw Center."

33.     In the 1960s, Connor B. Shaw, II, excavated or had excavated a pond into the 5-acre wetland on his property to create a recreational pond to be used by his four children as a swimming/fishing hole.

34.     The pond was built within the stormwater pattern of the SE quadrant of Section 13.

35.     The 1970 Geographic Information System (GIS) aerial map indicates that the historic stormwater pattern flowed into both the wetland and the pond on the Shaw property.

36.     The pond functioned as an impoundment dam in that it created a hydrologic disturbance that contributed to a diminished volume of stormwater flowing into adjacent western properties.

8

37.     The 5-acre wetland, and the pond located within it, provided detention for the flow-carrying network in the stormwater watershed pattern crossing through the Shaw land from its easterly neighbors' properties located on Harlem Ave.

38.     Prior to 1972, Defendant Connor B. Shaw, III, obtained an undergraduate degree in forest hydrology and a graduate degree in wild land hydrology from Utah State University in Logan, Utah.

39.     In 1972, Defendant Connor Shaw returned to Will County, Illinois, where he took a job writing environmental impact statements for Will, south Cook, and DuPage Counties.

40.     For ten years, Defendant Connor Shaw worked as a resource consultant on zone changes in the Chicagoland area, determining what effects proposed developments would have on water, soils, and vegetation in the report area, and how those elements would affect the development.

41.     In the early-to-mid 1970s, the Becker family, including Plaintiffs and brothers, Steve, Tom, and Jeff Becker, moved to Green Garden Township, Illinois, to reside on a 20-acre parcel (PIN #18-13-13-300-010-0000), adjacent to the western property line of the Connor and Marian Shaw 80-acre farm.

42.     In 1974, the Becker family built a home on the 20-acre parcel, which had been, for generations, planted as crop land, with its only trees located on the border boundaries.

43.     According to a former owner of the 20-acre parcel, Mrs. Lillie Wagner, the property had been in regular agricultural usage since the 1870s.

44.     There was a natural stormwater swale across the farm parcel, and this

9

swale remained dry during regular and moderate rain events and was passable with heavy farm machinery throughout the year.

45.     During major rain events, the most-significant stormwater came from the SW Quadrant, particularly, from the 40 acres to the south of the farm, which declined 25 feet in elevation.

46.     The flow and ponding from major stormwater events on the farm usually dissipated within a few hours to 36 hours.

47.     When the Beckers moved to their property, both the pond on the western border of the Shaw property, with its low banks, as well as its wetlands, were in full view from the Becker parcel.

48.     In the mid-1970s, Marian Shaw told Janet Becker and Plaintiff Jeff Becker that her husband, Connor B. Shaw, III, wanted a recreation pond for their children, but when excavating the pond, which was adjacent to what later became the Becker property, he ran into gravel at about 5-6 feet and had to abandon the entire project, leaving it as a shallow "nature pond" for the "benefit" of the ducks and geese.

49.     After the "nature pond fiasco," as Mrs. Shaw fondly referred to it, her husband excavated a second pond on the opposite side of their 80-acre farm to be used by his children for recreation as a swimming/fishing hole.

50.     From 1974 through the early 1980s, the pond on the western boundary of the Shaw property and its adjacent wetlands were fenced off and not used for any agricultural, irrigation, or livestock purposes.

51.     From the mid-1970s to the early 1980s, the wetland directly south of the pond was regularly covered with water and was filled with abundant cattails often

submerged, with the wetland area echoing with the constant sound of croaking of frogs and birds perched on reeds above the water.

52.     From the mid-1970s through the 1980s, the Beckers did not experience any significant water problems from the Shaw pond and its adjacent wetlands.

53.     In the late 1970s to the early 1980s, Defendant Connor Shaw and his brother Clarke Shaw, whose family raised sheep, and the Becker family, who had horses, baled hay together on the Becker farm.

54.     The Shaw family provided the baling equipment, the Beckers provided the hayfield, with both families assisting in the hay baling process.

55.     Each year in mid-June, the Beckers and Shaws baled together the first cutting of hay, followed by a second and sometimes third alfalfa cutting in July or August/September, depending on weather that year.

56.     In 1978, Defendant Connor Shaw and his wife, Jo, began Possibility Place Nursery on 5 acres of his parents' 80-acre parcel.

57.     Upon information and belief, sometime around 1978, Defendant Connor Shaw was elected for a single two-year term as a Will County Board member.

58.     Defendant Connor Shaw sought his position as a Will County Board member to gain favorable political and business connections in Will County government and its agencies to improve sales for his newly-formed nursery.

59.     In 1979, Defendant Connor Shaw and his wife, Jo, began building a house on a 2-acre portion of the far SW corner of his parents' farm.

60.     On or about September 1988, the Shaws undertook a silt removal of their pond and removed all pond water from that basin for that purpose.

11

61.     During the silt removal, Defendants Connor Shaw and PPN made alterations and raised the height of the existing pond banks to increase the volume of water the shallow pond could hold.

62.     The shallow, 1.2-acre pond was too small to supply the nursery's irrigation needs.

63.     Upon information and belief, sometime in the 1980s to the early 1990s, Defendants Connor Shaw and PPN installed an electric well pump to supply water to the pond for irrigation usage for its nursery.

64.     Even after the addition of the electric well pump, the pond, re-purposed as an irrigation basin, was continually plagued with problems, including silt build-up, repeated beaver dams, and pond wall breaches.

65.     From the late 1980s through 2011, during Defendant PPN's use of an electric pump to supply well water to its pond to irrigate its growing nursery, the Beckers did not experience any significant water problems from the Shaw property.

66.     In February 1996, the Will County Zoning Board approved the zoning application for a new 21-acre subdivision, Waterford Estates Subdivision, which was to be built on Harlem Avenue, about 1/2-mile north of Monee-Manhattan Road in Green Garden Township, Illinois.

67.     The Waterford Estates Subdivision property was adjacent to Defendant PPN's far NE corner.

68.     In April 1996, the Will County Planning and Zoning Commission Staff report made findings and recommendations in regards to the Waterford Estates Subdivision.

69.     The 1996 Construction Plans for the Waterford Estates Subdivision included building an outlet pipe for proposed 100-year flood routing, placed in its stormwater retention basin.

70.     The 1996 Construction Plans for the Waterford Estates Subdivision did not include a connected drain tile line flowing directly from the subdivision stormwater retention basin to deliver water 1/4 mile away to an open outlet pipe exiting next at, or near, Defendant PPN's pond.

71.     The Waterford Estates Subdivision stormwater retention basin was constructed sometime between mid-1996 and 1997, when the subdivision's newly built retention basin is seen on a 1997 GIS aerial map.

72.     The 1997 GIS aerial map also evidences the open water of a large, inventoried wetland south of the Waterford Estates Subdivision and east of Defendant PPN.

73.     The 1997 GIS topography contours indicate that the 5-acre wetlands surrounding Defendant PPN's pond had elevations of 756'-759', while the PPN pond walls had an elevation of 760'.

74.     The 1997 GIS aerial map evidences activity paths throughout the Becker property without a daily tile stream emanating from PPN.

75.     From the late 1990s onward, the Becker's mother, Janet Becker, decided to establish a bird sanctuary/nature area on the eastern border of the Becker farm, formerly a part of the Becker hayfield, and adjacent to the boundary with the Shaw pond.

76.     In May 2003, the Beckers invited Openlands, a conservation agency, to create a Neighborhood Habitat Enhancement Plan for Upper Forked Creek in Green

13

Garden Township with other local families.

77.    Openlands assisted the Beckers with a controlled burn to seed native wildflowers to create a large wildflower garden area just west of their bird sanctuary/nature area.

78.    In 2003, the Will County Board approved the Tuscan Hills Subdivision directly west of the Becker farm, and no engineering stormwater plans, the site layout designs, or staff report make mention of a daily stream of water flowing for months each year through either the Becker farm or the Tuscan Hills Subdivision land.

79.    The 2005 GIS aerial map evidences no daily water stream crossing the Becker farm emanating from Defendant PPN.

80.    The 2005 GIS aerial map indicates water in both the inventoried wetland south of Defendant PPN's pond, as well as open water in a separate inventoried wetland adjacent to and east of PPN and south of the Waterford Estates Subdivision.

81.    In June, 2010, Ordinance 10-164, Chapter 164 - Water Resource Ordinances, was passed into law for unincorporated Will County, which included ordinances for general stormwater requirements, sediment erosion, along with wetlands, water, and buffer standards, and site development permit requirements.

82.    After June, 2010, when these Water Resources Ordinances in Chapter 164 went into effect in unincorporated Will County, Defendants were responsible for adhering to the rules and regulations set forth in those Ordinances, along with all other Will County residents and businesses.

83.    In 2010, Section 164.162 enumerated the duties required by the Chief Subdivision Engineer, stating, in pertinent part: "Duties of Chief Subdivision Engineer --

14

The Chief Subdivision Engineer shall: (H) Investigate violations of this Chapter."

84.     The 2010 GIS aerial map evidences no daily water stream crossing the Becker farm emanating from Defendant PPN.

85.     The 2010 GIS map evidences water in both the inventoried wetland south of Defendant PPN's pond, as well as open water in a separate inventoried wetland adjacent to and east of PPN and south of the Waterford Estates Subdivision.

86.     In 2012, Denis Sullivan owned a 5-acre parcel located on South Harlem Avenue in Monee, Illinois (PIN #1813134000220000), which was adjacent to the eastern boundary of Defendant PPN's property.

87.     The U.S. Fish and Wildlife Service National Wetlands Inventory identifies that the Denis Sullivan property contains part of a protected freshwater emergent wetland.

88.     The wetland on Sullivan's property was part of the stormwater pattern in the SE Quadrant watershed for Section 13, which travels through the PPN property.

89.     On June 20, 2012, Defendant Will County Land Use Department issued a citation notice to Denis Sullivan, noting that an inspection of the property revealed the following apparent violations:  Count 1) Ordinance 164.021(A)(2), General Stormwater. No development shall increase flood elevations or decrease flood conveyance capacity upstream or downstream of the area under the ownership or control of the developer; Count 2) Ordinance 164.021(F), Depressional Storage.  The function of existing on-site depressional storage shall be preserved for both on-site and off-site tributary flows in addition to required detention; Count 3) Ordinance 164.037, Sediment and Erosion Control; Count 4) Ordinance 164.080(A)(1), Site Development Permit; and Count 5)

Ordinance 164.080(A)(1)(c), Wetland Impact.

90.     The June 20, 2012, Will County Land Use Department letter sent to Denis Sullivan required that for Sullivan's property to be brought into compliance with all Will County Codes and Ordinances, Sullivan must submit to the following: "CORRECTIVE ACTION: . . . Submit a jurisdictional determination for the U.S. Army Corp of Engineers to determine the proper permitting agency; [and], . . . A Wetland Delineation Report and a Wetland Restoration Site Plan shall be submitted along with a Site Development Permit Application for the wetland Restoration Project."

91.      On December 20, 2013, Susan Rowley of Encap, Inc., a wetland restoration company, sent a letter addressed to Defendant Greg Ratajczak at the Will County Land Use Department stating that she had been retained by Denis Sullivan to bring the property into compliance.

92.     Upon information and belief, Defendant Greg Ratajczak was intimately involved with the Will County Land Use Department case citing multiple violations against Denis Sullivan, whose property was adjacent to Defendant Connor Shaw and Defendant PPN.

93.     Ms. Rowley's December 20, 2013, letter explained to Greg Ratajczak that "[a]pproximately 1.03 acres of the wetland has been impacted by means of artificial fill material deposition within the wetland limits, averaging 2'-3' above the wetland normal water level (NWL)."

94.      According to the December 20, 2013, Wetland Delineation Report filed by Encap, Inc., the actual size of the wetland at issue covering several properties on Harlem Avenue was 4.34 acres, with 2.15 acres of wetland determined on-site found on

16

the Denis Sullivan property.

95.    Sullivan was required to pay Encap, Inc., a wetland restoration company, the proposed cost of $89,961, plus a Will County Land Use Department permit fee to Will County of $1,013 dollars, in order to come into compliance with respect to the wetland citation issued by the Will County Land Use Department, totaling $90,974.00.

96.    The 2014 GIS Topography contours indicate that the 5-acre wetlands surrounding Defendant PPN's pond had elevations of 756'-759', while the PPN pond walls had an elevation of 760'.

97.    The 2015 GIS aerial map indicates that the open water of the inventoried Sullivan wetland, adjacent to Defendant PPN and south of the Waterford Estates Subdivision, had dramatically diminished in size.

98.    From 1972 through 2017, a period of 45 years, Defendant Connor Shaw was directly involved with Will County Government, numerous Will County governmental agencies, and other related entities, including a term as a Will County Board member, as well as engagement with Soil and Water Conservation, USDA, ACOE, Forest Preserve Districts throughout Will County, local municipalities in Will County, Non-Profits in Will County, Joliet Junior College in Will County, Morton Arboretum, and the Chicago Botanical Gardens, to name a few.

99.    From 1974 through 2017, the Beckers enjoyed the use of their entire property, which included walking unimpeded to the north end of their land, fishing at their pond, as well as regularly cutting grass and paths with riding mowers throughout their 20-acre parcel, without any significant water problems from the Shaw property.

**2017 Major Pond Re-Construction/Wetland Excavation by PPN**

17

100.    The U.S. Fish and Wildlife Service National Wetlands Inventory evidences that PPN's property contains the majority of a 1.27-acre freshwater emergent wetland, adjacent to the south end of the PPN pond.

101.    The 2017 GIS aerial map indicates that there was no daily water stream crossing the Becker farm emanating from PPN.

102.    In the Fall of 2017, PPN undertook a major pond re-construction, which dramatically altered the size and height of the existing PPN pond.

103.    A large excavator moved huge mounds of dirt, including adding fill onto the southern banks of the PPN pond.

104.    A large trench measuring 200' by 30' was dug from the pond into PPN's inventoried wetland.

105.    A review of GIS aerial maps prior to 2018 and those taken after 2018 evidence a new 200' x 30' trench from the pond into the PPN inventoried wetland.

106.    A large excavator dumped fill along the western side of the PPN wetland near the Becker's driveway.

107.    Will County Ordinance Section 164.067, Wetland, Waters and Buffer Standards, Section (B)(1), provides: "Development activities that create an impact within a wetland, waters of the United States, isolated waters of the County, or their associated buffers, regardless of the Corps of Engineers jurisdiction, must submit a site development permit application to the County Land Use Department."

108.    Will County Ordinance Section 164.067, Wetland, Waters and Buffer Standards, Section (B)(3), provides: "No site development permit will be issued where the activities will detrimentally impact, effect or destroy wetlands, waters or their

18

associated buffers . . ."

109.     Prior to the 2017 excavations, Defendants PPN and Connor Shaw did not obtain the required site development permits from Will County Land Use Department in order to allow PPN to excavate through its inventoried wetland and alter PPN's pond bank walls.

**Damages to the Becker Farm after 2017 PPN Pond/Wetland Alterations**

110.     In January 2018, the longstanding bird sanctuary/nature area on the eastern boundary of the Becker property was blanketed with hundreds of large and small trees, new saplings, and dense bushes.

111.     From late 1990s through 2017, the enormous volume of trees and bushes in this 1.5-acre bird sanctuary/nature area evidenced prime ecological conditions for these trees and bushes to thrive in the Bryce hydric soil on the Becker property, which was directly adjacent to the existing PPN pond.

112.     The combined 2-acre location, which was comprised of the 1.5-acre bird sanctuary/nature area paired with the adjacent native wildflower meadow, created by Openlands in 2003, was designed to provide an optimal habitat for Illinois and migratory bird species.

113.     In 2018, Tom Becker's eye specialist recommended therapies for his blindness.  As a result, Becker began cultivating flowers for the purpose of creating floral bouquets.

114.     In the Spring of 2018, the Beckers began noticing intermittent, unexplained saturation in the Becker stormwater swale, while cutting grass across their property.

115.     By the Summer of 2018, the central portion of the Becker stormwater swale was saturated, while the swale from the SW Quadrant was dry and mowable.

116.     Later in the summer, the Beckers noticed that the saturation in the Becker swale had disappeared.

117.     In October 2018, Tom and Jeff Becker, while removing an illegal deer stand/blind on the NE corner of their property, were confronted by a bow hunter in full camouflage, who admitted to placing a deer scent lure, salt licks, motion cameras and seeding a plot of soybeans in order to create a deer kill zone on the pipeline easement of the Becker property.

118.      The hunter admitted that he had been invited to hunt on the Becker farm by PPN owner, Connor Shaw, for the purpose of eliminating area deer from interfering with PPN tree nursery stock.

119.      During 2019, Tom Becker began expanding gardens and growing heirloom and vintage cultivars for creating organic floral bouquets.

120.     In the Spring of 2019, there was an increase in the volume of water flowing through the Becker swale.

121.     In May, 2019, while clearing dense bushes along the Becker/Shaw property border to track the source and location of the continuous volume of flowing water, the Beckers observed four water discharge sites coming from or near the PPN pond.

122.      In May 2019, the Beckers observed a PPN pond bank wall discharge site at approx. 1,435' north of Monee-Manhattan Road at the SE corner of the Becker farm.

123.     At this pond wall location, the water poured downhill from an opening at

20

approximately 4' high, causing water to pool on the Becker land, as well as saturate the ground below.

124.     This pond wall discharge was intermittent, as the flow would start and then stop abruptly for several days or weeks, before restarting and then stopping again.

125.     In May 2019, the Beckers realized that the pond bank water discharge did not follow any recognizable pattern, as it was unrelated to rain events, a time of day, or day of the week.

**Beckers' May 20, 2019, Letter to Connor Shaw and PPN**

126.     On May 20, 2019, the Beckers sent a letter to PPN owner, Connor Shaw, to request a meeting to discuss the substantial water coming from PPN property.

127.     In the letter, the Beckers complained to Connor Shaw of "a steady flow of water coming from your land that is entirely inconsistent with stormwater events."

128.     The letter further noted that "the area around your pond is discharging so much water into the latter portion of our swale system that we were unable to access our own pond and to otherwise manage our property for much of last year, and this continues to the present day."

129.     In June 2019, after receiving no response from Connor Shaw for over a month, Steve Becker stopped by the Shaws to set up an appointment, but no one came to the door.

130.     On the morning of July 29, 2019, the Beckers' stormwater swale was filled with a steady stream of flowing water coming from numerous discharge sites near the PPN pond area.

131.     On July 29, 2019, Steve Becker sent an e-mail directly to the PPN website

to again complain about these serious flooding issues emanating from PPN land and to request the availability of someone from PPN to meet and discuss the flooding.

132.    On July 30, 2019, Steve Becker received an e-mail response from PPN Office Manager, Terry Rohwedder, who agreed to set up a mid-August meeting with the Shaws.

133.    On the same date, the steady stream of flowing water coming from all discharge sites near the PPN pond area, which had been daily, abruptly and completely stopped.

**August 14, 2019, Meeting Between the Beckers and Connor Shaw**

134.    On August 14, 2019, Steve and Jeff Becker met Connor Shaw at PPN and inquired as to whether this constant stream of flowing water dumping onto their farm was from an open subsurface or broken drain tile line.

135.    At the meeting, Connor Shaw denied that the water was tile water and assured the Beckers that this water was simply rainfall flowing across PPN property from his eastern neighbors.

136.    In response to Jeff Becker's statement that the flooding did not begin until after PPN's 2017 pond re-construction and wetland excavation, Shaw stated that his nursery did not conduct pond re-construction in 2017 and that he had no wetland on his property.

137.    Connor Shaw acknowledged, however, that PPN had removed 3' of silt from its PPN pond several years ago.

138.    The removal of 3' of sediment from a 1.2-acre pond amounts to approximately 5,800 cubic yards or about 6,970 tons of sediment or dirt.

22

139.     Moreover, Connor Shaw told the Beckers that he was "directing" all water sources on his land towards his pond for the benefit of his nursery and added that he was "not going to lose 10 acres of detention on my property."

140.     Jeff Becker then complained to Connor Shaw that the western bank pond wall had a breach or discharge hole dumping water, and he requested Connor Shaw to come look at it.

141.     Connor Shaw responded that there was no breach in his pond wall bank and said there was nothing for him to see and nothing for him to review.

142.     Connor Shaw concluded by asking the Beckers what they wanted from him at this meeting, to which Steve Becker replied, "Stop dumping water on our land."

143.     Connor Shaw then stated that since this was simply rainfall, he would not be making any changes to his nursery and ended the meeting with the Beckers.

144.     On August 21, 2019, despite a predicted thunderstorm that never materialized, the Beckers observed water pouring from several PPN locations, with 12' of water flowing through the Becker swale.

145.      In late September 2019, PPN began dumping the same steady stream of flowing water onto the Becker farm from four separate locations.

146.     In the first week of October 2019, Tom Becker called and spoke with Defendant Brian Radner at the Will County Land Use Department and discussed the serious flooding problems and damage the Becker farm was experiencing.

147.     Brian Radner told Tom Becker the person he needed to contact was Defendant Greg Ratajczak, who worked in the Will County Code Enforcement Division.

148.     In the first week of October 2019, Tom Becker called and left several

messages about flooding on the Becker farm with Will County Code Enforcement officer
Ratajzcak, but Ratajczak never responded to any of Becker's messages.

**Tom Becker's October 9, 2019, Complaint Letter to Will County Land Use**

149. On October 9, 2019, after receiving no response from Ratajczak, Tom
Becker sent a follow-up letter to Radner in the Will County Land Use Department, with
numerous details, a series of photos, and questions about flooding problems from PPN.

150. Tom Becker specifically noted in his letter that, until 2018, the Becker
family had enjoyed the use of their entire farm for the past 45 years without any
significant water problems from PPN.

151. Tom Becker further wrote: "In the Fall of 2017, the Possibility Place
Nursery made significant changes to a retention pond adjacent to our border. The pond
was enlarged to serve as a commercial irrigation reservoir filled by both a regular and
deep-well pump, and its basin now has long spillway spikes. Importantly, a marshy
detention area directly South of the pond was eliminated in the expansion."

152. In regard to pollutants, Tom Becker explained: "Most disconcerting,
however, is that the waste water itself has a milky film on it, and algae blooms are now
present throughout the forest floor and in the swale. [photo citation omitted] These algae
blooms evidence eutrophication, likely from herbicide glyphosates and/or phosphorous
loading fertilizers. Both are toxic to aquatic organisms. In short, the nursery is dumping
its polluted waste water into a stormwater pattern that flows directly into Forked Creek."

153. Moreover, he pointed out: "This discharge of waste water continues 24
hours a day, and the volume is so significant as to saturate our West swale to a width of
twenty feet. Not only is this man-made stream again preventing us from using or

managing half of our land, but we have maintained an organic property here for 45 years."

154.    On October 9, 2019, Radner forwarded Tom Becker's letter regarding PPN to Will County Code Enforcement Manager Ratajczak.

**Will County Code Enforcement Manager Greg Ratajczak**

155.    On October 10, 2019, Defendant Ratajczak showed up unannounced at the Becker farm, stating he got a complaint and wanted to know what "our problem is."

156.    On that occasion, Tom and Jeff Becker took Ratajczak to five locations where PPN was currently dumping water onto the Becker land.

157.    When Tom and Jeff Becker showed Ratajczak the combined result of the steady discharges of water from PPN running into the Becker swale, Ratajczak remarked, "That is a lot of water."

158.    Tom and Jeff Becker also showed Ratajczak the location of the discharge site in the PPN pond wall bank, at approximately 4' high, where water was, at the precise moment of Ratajczak's visit, pouring a steady stream of water downhill with a large pool accumulating on the forest floor and saturating the ground below.

159.    The Beckers explained to Ratajczak that this pond wall discharge site turned on and off at irregular intervals, acting like a riser pipe, and the discharge hole first appeared after PPN's 2017 pond alterations.

160.    When Jeff Becker told Ratajczak he wanted him to see the mounds of dirt that PPN had added into its wetland and the trench PPN dug through the wetland, Ratajczak said he had already seen enough and that he wanted to have a conversation with PPN.

161.     During Ratajczak's on-site visit at the Becker farm, Ratajczak took no photos of the stream of water flowing in the Becker swale, no photos of each location where water was emanating from PPN, no photos of the discharge site in the PPN pond wall, no photos of the mounds of dirt added into the PPN wetland, and no photos of the 200' x 30' trench PPN dug through its wetland.

162.     Ratajczak's visit at the Becker property lasted less than 15 minutes before he left to meet with PPN.

**Greg Ratajczak's Attempt to Broker Free Water Easement for PPN**

163.     After several hours at the Shaws, Ratajczak returned to the Becker farm and spoke with Tom and Jeff Becker, stating that the Shaws are "really wonderful people."

164.     Next, Will County Code Manager Greg Ratajczak told Tom and Jeff Becker that the Shaws wanted him to make Beckers an offer to resolve the water problems.

165.     On that occasion, Ratajczak made Tom and Jeff Becker the following offer on behalf of the Shaw family: The Shaws would trench and pay for a subsurface pipe line to be built through the Becker property at no cost to the Beckers, which would pipe water from the nursery under the Becker farm for the width of the Becker farm.

166.     Ratajczak told Tom and Jeff Becker that he thought this was a generous offer from the Shaws and that Beckers should accept it, since Shaws were going to pay the full cost for all pipes, machinery, and labor.

167.     Tom Becker declined Shaw's offer, stating that dumping the same polluted water westward into the Tuscan Hills subdivision was not right, as several

homes are in the floodplain and that the water would dump into the federally-protected

wetland, the pine forest, and into Forked Creek.

168.     Jeff Becker further responded to Ratajczak's water easement offer on

behalf of the Shaws by stating that dumping this water problem onto their neighbor,

Tuscan Hills, would be wrong and was most likely illegal.

169.     Once the Beckers refused to accept Ratajczak's attempt to broker a water

easement for the Shaw family's benefit, Ratajczak's demeanor immediately changed, and

he became visibly angry.

170.     On October 10, 2019, Ratajczak's violation log states that PPN's Tristan

Shaw told Ratajczak that he knew what the problem was and that the Becker water

damage was due to a large storm in September and "[s]urface runoff from the broken tile

is draining into the pond.  The pond is overflowing at the spill way."

171.     Ratajczak's October 10, 2019, violation log fails to document his efforts to

persuade the Beckers to grant Connor Shaw and PPN a free water easement under the

Becker farm.

**Ratajczak Cites Wrongly Identified Nursery with Irrelevant Code Violation**

172.     On October 11, 2019, Ratajczak sent to and cited "RESPONSIBILITY

PLACE NURSERY" [sic] with a single violation in Case #19LU01076 DR: Count 1,

Ordinance 164.100(A), Long Term Maintenance, Unless maintenance responsibility has

been delegated to and accepted by another qualified entity under Chapter 164.100, the

owner shall maintain that portion of a stormwater drainage system located upon his or her

land.

173.     The final corrective action indicated for PPN was to "[r]eplace the broken

tile with new tile. And, reconnect the new tile to the existing tile." The violation notice further stated: "This corrective action needs to be completed by November 1, 2019."

174.     In Case # 19LU01076 DR, Ratajczak did not cite or require corrective action to be taken by Defendant PPN for its 2017 pond alterations, wetland violations, and pond wall discharges located at 1435' and 1520' north of Manhattan-Monee Road, respectively.

175.     On October 11, 2019, Ratajczak left a phone message with Tom Becker to inform him that he had cited PPN with a broken tile violation.

**Tom Becker's October 11, 2019, Response to Ratajczak's PPN Broken Tile Citation**

176.     On October 11, 2019, Tom Becker sent an e-mail response to Ratajczak to inform him that during his brothers' meeting with Connor Shaw in August 2019, Shaw never said that the "nursery had an issue with a broken tile."

177.     Tom Becker further stated: "Regardless, we are not convinced that the huge volume of water dividing our property in two is the result of a broken tile. We have not had a significant rain event since September 27, two weeks ago. Yet, the two locations where the waste water is being dumped on our land act independent of each other. They turn on and off like the opening and closing of faucets. Certainly a constant-flowing broken tile would not explain this."

178.     Later that afternoon, Ratajczak called Tom Becker in response to his e-mail and told him that the cause of the water coming from the PPN property was from a broken tile.

179.     When Tom Becker asked Ratajczak for a rough estimate of when PPN's broken tile would be fixed, Ratajczak told him that the Shaws would be given as long as

28

they needed.

180.    When Tom Becker asked Ratajczak to explain the cause of water dumping downhill from the PPN pond wall hole,  Ratajczak told Becker the water could be coming from the Becker farm and instead be "traveling uphill" and only appearing to come from the nursery.

181.    Ratajczak further asserted to Tom Becker that the reason the Beckers were having water problems was because they have hydric soil on their farm.

182.    After Tom Becker complained to Ratajczak that the Beckers could not cross their property with machinery to remove invasive trees in the hayfield, Ratajczak warned Tom Becker that if he attempted to do any work on his property he would be required to hire an engineer to prepare a site development plan and get a County permit because if he removes a tree trunk he is "moving earth."

183.    On November 6, 2019, Ratajczak's violation notes for Case #19LU01076 DR stated that the violation letter he originally sent was returned due to no mail receptacle, so Ratajczak sent another violation letter.

184.    On November 6, 2019, Ratajczak again cited the wrongly-named nursery, RESPONSIBILITY PLACE NURSERY [sic], with the identical violation in Case #19LU01076 DR.

185.    On November 6, 2019, the final corrective action required by Ratajczak for PPN was to "[r]eplace the broken tile with new tile.  And, reconnect the new tile to the existing tile."  The violation notice further instructed: "This corrective action needs to be completed by December 4, 2019."

186.    On December 3, 2019, Ratajczak wrote Tristan Shaw the following:

29

"Tristan, Thank you very much for your help! Please e-mail me the information you have on replacing the broken field tile."

187. On December 4, 2019, according to Ratajczak's violation log notes for Case #19LU01076 DR, he stated: "Tristan e-mailed me pictures of the repaired field tile. See e-mail in evidence."

188. On December 5, 2019, according to Ratajczak's violation log notes, "A conformance letter was mailed. This case is closed."

189. On December 5, 2019, Ratajczak sent a letter to PPN dismissing the nursery's violation of Ordinance 164.100(A) regarding a broken tile.

190. On or after December 5, 2019, Ratajczak never contacted the Beckers to inquire as to whether the repair of this field tile had any impact on the flooding of their farm, nor did he inform the Beckers that he had closed the broken tile complaint against PPN.

191. In March 2020, the first wave of the Covid-19 pandemic began affecting the United States, with government agencies and businesses closing operations.

192. In late Spring of 2020, Tom Becker learned that, due to the Covid-19 pandemic, no Will County code enforcement on-site inspections were being performed.

193. In 2020, Tom Becker continued expanding gardens and growing heirloom and vintage cultivars for creating organic floral bouquets.

194. From late September 2019, through June 2020, the constant PPN flooding and flowing water emanating from numerous locations from the PPN property continued damaging the Becker farm.

**Bushes and Trees Destroyed in Becker Nature Area Due to PPN Water Damage**

195.     By 2020, the Bryce hydric soil in the 1.5-acre bird sanctuary/nature area of the Becker property had changed from an aerobic to anaerobic condition, a dramatic ecological and environmental change caused by the over-saturation of water dumping constantly from the PPN property from multiple locations.

196.     Throughout 2020, the bushes, smaller trees, and saplings in the Becker bird sanctuary/nature area died as a result of the saturated soil condition, which began in 2018.

197.     In Spring 2020, the bushes in the bird sanctuary/nature area adjacent to the PPN pond died, while simultaneously detecting no similarly-situated dead bushes throughout other locations on the Becker farm, with the identical soil type, bushes and trees.

198.     In Summer 2020, Jeff Becker began hauling hundreds of dead bushes, saplings and smaller and some larger trees from the Becker bird sanctuary/nature area to a burning pile.

199.     In Summer 2020, a sampling of the species of dead bushes, saplings and trees included: high bush cranberries, arrowwood viburnums, honeysuckles, dogwoods, crab apples, magnolias, maples, elms, alders, ash, willows, wild black cherries, mulberries, black walnuts, box elders, Ohio buckeyes, junipers, blackthorns, hawthorns, and other unknown varieties.

200.     In early Fall, 2020, Beckers began to witness numerous species of their larger, more established trees, with deeper root bases, stressed and dying in the Becker bird sanctuary/nature area.

201.     In September 2020, 30-year-old honeysuckles on the eastern border of the

Becker driveway next to the PPN fence line began to die.

202.    On September 19, 2020, while clearing out these dead, established bushes, Jeff Becker observed, for the first time, a new source of PPN water discharge flowing through a ditch along the eastern edge of the Becker's driveway for approximately 200'.

203.    On September 19, 2020, Jeff Becker observed that the source of this new PPN water discharge was coming from a trenched pathway at approx. 825' N of Monee-Manhattan Road traveling east to west from the interior of PPN, before turning south along a 200' ditch along the Becker driveway.

204.    On September 19, 2020, Jeff Becker observed pooled water sitting on the Becker side of the fence at the base of multiple bushes and trees with their roots saturated in water.

205.    On November 26, 2020, PPN began flooding the Becker farm from multiple sites, despite a noticeable absence of any precipitation.

**Beckers' December 30, 2020, Letter to PPN about Ongoing Flooding**

206.    On December 30, 2020, Steve Becker sent another letter to PPN concerning the ongoing flooding damaging the Becker property, which had restarted on Thanksgiving Day, 2020.

207.    In particular, Steve Becker stated: "Your use of our land as detention for your commercial business and your co-mingling of irrigation runoff, pump, and tile water with stormwater drainage is illegal.  No court will permit you to operate such an irrigation system that appreciably damages the value and uses of an adjoining landowner's property."

32

208.   Steve Becker also discussed PPN's "recent attempt to discharge field runoff, with a 200-foot trench dug next to our driveway."

209.   Steve Becker further noted: "Since the time of the issuance of your violation notice in October 2019, we have not received a single phone call, e-mail message, or visit addressing any efforts on your part to update us on the actions you have taken to correct the flooding of our property.  If we do not promptly hear from you concerning these issues, we will have no choice but to provide the appropriate authorities with the evidence we have gathered to ensure this flooding ends once and for all."

210.   On January 29, 2021, Connor Shaw's sole response to the Beckers' letter was to e-mail a copy of the December 5, 2019, code enforcement letter closing its broken tile complaint against PPN.

211.   On February 11, 2021, Tom Becker spoke with Julie Rimbault, Senior Regulatory Specialist at the Chicago District of the Army Corps of Engineers (ACOE) for a jurisdictional review of the PPN wetland and pond to determine if ACOE had jurisdiction over this wetland location.

212.   On February 16, 2021, Tom Becker sent Julie Rimbault at the ACOE a completed UAR form, along with attachments including a detailed history, photos, maps, and charts regarding the flooding of the Becker farm by PPN.

213.   On February 23, 2021, Julie Rimbault sent an e-mail to Tom Becker with her findings, noting that the PPN wetland basin was a man-made pond that was constructed in what was an isolated wetland at the time, and because of that, under the current Navigable Waters Protection Rule, this pond was not jurisdictional at the federal level.

33

214.     On February 23, 2021, Julie Rimbault recommended that Tom Becker coordinate with the Will County Land Use Department, who Rimbault had copied via an e-mail to Nicole Roedl, for jurisdiction over this wetland location.

215.     On February 23, 2021, Defendant Nicole Roedl from the Will County Land Use Department wrote Tom Becker: "I received this e-mail from Judy [sic] Rimbault and I just wanted to get a bit more information.  It sounds like you have a drainage complaint stemming from a pond that is not within the jurisdiction of the Army Corps of Engineers.  Is the pond on your property?  If you could provide me with an address and a little background, I can forward this information to our Code Enforcement division to see if there is a violation on the property."

**February/March 2021 Complaints to Will County Engineer Technician Roedl**

216.     On February 25, 2021, Tom Becker sent Roedl a seven-page complaint letter including photographs and historical maps of Becker/PPN properties, photographs showing flooding from PPN into the Becker farm, USGS rain charts evidencing PPN flooding was not due to rainfall events, photographs of polluted water being dumped onto the Becker farm, and photographs of PPN's 2020 landfill into its wetland.

217.     Tom Becker's complaint letter stated: "However, in the Fall of 2017, an adjacent nursery business dredged, re-excavated and enlarged a retention basin in a wetland next to our farm, without any county-reviewed site development plan.  The following year, we noticed excessive water in our pasture swale.  By the following Spring, we identified five locations across a 250 ft. area where water was dumping 24-hours-a-day, seven days a week, near this basin into our land.  The collective volume of water causes a continuous man-made stream that is 15-20 feet wide, dividing our farm in

two.  It can extend 800 feet across our land, saturating our forest, causing established trees and bushes to die, eroding our pasture swale, and turning our floodplain into a swamp."

218.    Tom Becker noted: "We believe the water source for the stream pouring through our farm is the result of the re-designed nursery basin being fed 'free water' from deliberately opened subsurface drain tile lines, with our farm, and other properties, being used as a detention ditch."

219.    He also asked Roedl to: "Please compare a 2017 aerial map (above right) with a 2019 aerial map (middle right) that reveals the enlarged size and bizarre, elongated pond spikes jetting from the basin (see magenta highlight) that likely reach to subsurface tile lines."

220.    In addition, he sent photographic evidence to Roedl of 2021 pollutant discharge from PPN: "Above is a recent example of polluted tile water in our pasture swale coming from the nursery."

221.    Furthermore, he provided photographic evidence to Roedl of landfill in PPN's wetland: "In addition, the nursery is presently dumping landfill directly into the wetland south of the basin (see photo at right)."

222.    Finally, he complained of the bias the Beckers had experienced from Defendant Ratajczak: "Yet, the code enforcement officer assigned to our complaint, Greg Ratajczak, was a noticeable advocate for the nursery.  He said the business would have unlimited time to fix the problem and also tried to broker a water easement deal for the nursery to run drain lines through our farm.  We declined.  Then, during a subsequent phone call, I noted that one location of water dumping was a pipe in a basin wall.  But

35

Mr. Ratajczak surmised this water could be coming from our own farm instead, 'traveling uphill' and only appearing to come from the nursery."

223.    Tom Becker specifically requested that the complaint be handled by another Will County Code Enforcement Officer and noted that Greg Ratajczak "has cost us another year of flooding damage to our farm."

224.    On the morning of March 15, 2021, after having not received any response from Roedl for over two weeks, Tom Becker sent an additional complaint letter to Roedl with recent photos of flood damage and pollutants being dumped on the Becker farm by PPN.

225.    On March 15, 2021, Tom Becker made the following request for engineering staff to come review the flooding on the Becker farm: "With the snow melt ended and the heavy Spring rains not yet begun, the present conditions are ideal to view the flooding coming from six discharge locations from the Possibility Place Nursery. Can you schedule an on-site appointment for us with engineering staff to view this ongoing flooding?"

226.    Tom Becker further stressed to Roedl the urgency of resolving the flooding damage: "Despite having raised these issues to the nursery almost two years ago, we are still unable to freely use or manage half of our property (about ten acres) due to the flooding dividing our farm in two.  Moreover, we continue to find established trees and bushe[s] (sic) rotting and dying, due to the anaerobic conditions caused by the continuous flooding and soil saturation.  If you will be handling our flooding concern, or, if you have referred our complaint to another department, please let us know, as we have not received notification.  Thank you for your help."

36

**Greg Ratajczak's March 15, 2021, Visit to the Becker Farm**

227.     On March 15, 2021, Defendant Ratajczak showed up unannounced at the Becker farm to discuss PPN's flooding of the Becker property.

228.     Tom and Jeff Becker took Ratajczak to locations discharging water at or near the PPN pond, including the stream of water dumping downhill from the discharge hole, approximately 4' high, coming from the PPN pond wall.

229.      Ratajczak suggested that closing the pond wall discharges would not stop the other areas of flooding of the Becker property and again recommended that the Beckers grant PPN a water easement for piping water under the Becker farm.

230.      Tom Becker pointed to his home and said a pipeline cannot go west as it would travel into the Becker home, buildings, and gardens.  Tom Becker then pointed to the subdivision and stated that the pipe could not go northwest, as it would discharge into the subdivision's homes, the federally protected wetland, the pine forest, and Forked Creek.

231.      During that meeting, Ratajczak informed the Beckers that he needed to call Will County to find out if PPN had a permit when it made the 2017 pond alterations.

232.     After the call, Ratajczak informed Beckers that PPN had not obtained a Will County permit for its 2017 excavation work.

233.     Ratajczak stated that he would go speak with Shaws about getting the PPN pond wall discharge hole closed.

234.     Jeff Becker stated that he wanted to show Ratajczak the wetland location where PPN had trenched through its wetland.  Ratajczak, for the second time, responded

that he did not need to see anything else.

235.    On March 19, 2021, while outside on their land, Tom and Jeff Becker observed Tristan Shaw using a front-end loader making numerous trips from the interior of PPN to obtain dirt and clay to dump from the top of the PPN pond bank to cover the pond wall discharge site.

236.    Tom and Jeff Becker approached Tristan Shaw, and Tom Becker asked Tristan to explain the cause of intermittent water coming from this discharge hole and its appearance after the PPN's 2017 pond excavations.

237.    Tristan Shaw replied it was just a "muskrat hole."

238.    When Jeff Becker told Tristan Shaw that he believed the flooding on the Becker farm was due to PPN's 2017 excavations, Tristan Shaw acknowledged that several years ago the nursery had done a basin excavation, and the sediment PPN removed was used to raise the height of its pond walls.

239.    Tom Becker requested that Tristan Shaw come to see the water coming from the nursery flowing across the Becker pasture swale.

240.    After observing this flowing water in the Becker swale coming from the nursery, Tristan Shaw admitted that this was tile water.

241.    Tom Becker asked Tristan Shaw if the nursery property was having the same tile water flow across its property.

242.    Tristan Shaw acknowledged that the water flow does not exist on the Shaw nursery.

243.     Tom Becker raised to Tristan Shaw his concerns about landfill in the Shaw wetland and the 200' long ditch of water along the Becker driveway.

38

244.    Tristan Shaw agreed to remove the landfill in the wetland and said he would fill in the 200' long trench along the driveway fence line.

245.    Tristan Shaw never repaired either location.

246.    On March 20, 2021, Tom Becker wrote Roedl an e-mail letter to inform her of the statements that Tristan Shaw had made to Tom and Jeff Becker on the previous day, in hopes that this would assist Roedl in determining the causes of the ongoing flooding currently damaging the Becker farm.

247.    On March 22, 2021, Roedl responded to Tom Becker's e-mail as follows: "Thank you for this information, Tom. I will forward this to Greg Ratajczak. He visited the property last week and definitely identified alterations to the pond that are causing damages to your property."

248.    On March 22, 2021, Tom Becker sent an e-mail to both Roedl and Ratajczak, with an attached letter, with photographs of two aerial maps, one from 2015 and another from 2018, which indicated alterations to PPN's pond and trenching into PPN's wetland.

249.    Tom Becker stated: "On March 19, [2021] while my brother and I were outside, we met Mr. Tristan Shaw, son of the nursery owner, and asked him to view the flooding impacts. During this meeting, Mr. Shaw acknowledged the water source flowing through our farm is tile water. He also confirmed the excessive water volume presently pouring from the basin at our property line does not exist on the nursery's portion of the stormwater drainage pattern."

250.    On March 22, 2021, Tom Becker requested from Roedl the following: "We believe the nursery should submit for your review a tile survey, a wetland

delineation, and a site development plan, prepared by a qualified engineering firm, to resolve the disastrous consequences from their unsupervised 2017 wetland and wetland basin alterations."

251.    On March 25, 2021, Ratajczak showed up unannounced to the Becker home and explained to Tom Becker that he was having difficulty finding a violation to cite against PPN.

252.    Ratajczak told Tom Becker that the cause of this flooding could be "a new spring because, you know, the Earth moves."

253.    Tom Becker informed Ratajczak that PPN had committed multiple stormwater and wetland violations.

254.    Later that afternoon, on March 25, 2021, Ratajczak returned to the Becker farm with Connor Shaw in Ratajczak's car.

255.    When Tom Becker stated to Shaw that he did a pond excavation and dug into the wetland, Connor Shaw responded that there was no excavation and there is no wetland on his property.

256.    When Tom Becker stated to Connor Shaw that there are stormwater ordinances that have to be followed, Connor Shaw replied that there are no ordinances that apply to him.

257.    Connor Shaw then came within two inches from Tom Becker's face, started screaming at Becker about how he is an educated hydrologist, about how smart he is, about how stupid Tom Becker is, and how stupid the Beckers' complaint is.

258.    Greg Ratajczak did not intervene in any way and allowed Connor Shaw, the PPN owner and alleged violator, to continue screaming at Tom Becker within inches

40

from Becker's face, despite Ratajczak's knowledge that Tom Becker is legally blind.

259.    Steve Becker, who was inside the Becker home and heard screaming, rushed outside and witnessed Connor Shaw yelling loudly at his brother Tom, mere inches from his face.

260.    Steve Becker demanded of Ratajczak to know what was going on and told Connor Shaw to back off.

261.    Steve Becker then asked Ratajczak, "What are you going to do about this?"  Ratajczak remarked, "This is above my pay grade," and Ratajczak said would be referring the matter to County engineering.  Ratajczak then told the Beckers, "I better get him out of here."

262.    On March 25, 2021, Ratajczak's violation log noted, "Tristan [Shaw] stopped the breach at 1 point of the 6 breaches.  Tristan also acknowledged that they do have a field tile that's draining into the pond."

263.    The violation log further states that Ratajczak then met with Connor Shaw and "asked him if there's a field tile that's draining into the pond.  He acknowledged that there is."

264.    Ratajczak's violation log further memorialized: "I called Nicole Roedel to see if draining a field tile into the pond is an ordinance violation.  She sent me the section of the ordinance that says that it is.  Here's what the ordinance says.  Section 164.022(D): (D) Existing subsurface and surface drainage systems.  (1) Stormwater systems shall properly incorporate and be compatible with existing subsurface and surface drainage systems including agricultural systems.  Designs shall not cause damage to the existing drainage system(s) or the existing adjacent or tributary land including those with

41

agricultural uses....(2) The following principles and requirements shall be observed in the design. (a) Off-site outfall. Existing agricultural subsurface and surface drainage systems shall be evaluated with regard to their capacity, condition, and capability to properly convey low flow ground water and two-year site runoff to a surface outlet without damage to downstream structure and land use on the adjacent properties....Diverting the field tile into the pond which is causing damage to the Becker property is an ordinance violation."

265. On March 26, 2021, Ratajczak mailed a code violation letter to the Shaw Family TR, and not to PPN or Connor Shaw.

266. The violation letter indicated: Violation: "Diverting a field tile into a pond. Causing property damage to adjoining property."

267. The violation letter stated: "An inspection of the property above reveals the following apparent violations(s): Count 1 Ordinance 164.022(A) Stormwater Discharges - Stormwater facilities shall be required and designed so that runoff exists [sic] the site at a point where it exited prior to the subject development and in a manner such that flows will not increase flood damage to adjacent property except when otherwise approved by the Chief Subdivision Engineer. Concentrated discharges from new development must enter conveyance systems capable of carrying the design flow rate without increasing flood damages or maintenance costs downstream."

268. The violation letter then noted: **Final Corrective Action(s):** Remove the diverted filed tile, that drains into the pond, and reconnect the diverted field tile to the previous filed tile where the diverted field tile came from. The letter also listed: "**CORRECTIVE ACTION:** The property needs to be brought into compliance with all

42

Will County Codes and Ordinances."

269.    The March 26, 2021, Will County Land Use violation letter noted: "This corrective action needs to be completed April 15, 2021.  We remain hopeful that you will call the undersigned Inspector so this matter may be resolved agreeably."  In addition, the violation letter listed Greg Ratajczak, Code Enforcement Manager, as the party to contact.

270.    On March 26, 2021, Greg Ratajczak cited the Shaw Family TR with Ordinance 164.022(A) on Stormwater Discharges, but did not cite the Shaws with 164.022(D) Existing subsurface and surface drainage systems, the specific Code Section identified by Will County engineer technician Nicole Roedl as the PPN ordinance violation causing damage to the Becker property.

271.    Section 164.022 (D)(1) states: Stormwater systems shall properly incorporate and be compatible with existing subsurface and surface drainage systems including agricultural systems.  Designs shall not cause damage to the existing drainage system(s) or the existing adjacent tributary land including those with agricultural uses."

272.    From March 26, 2021, through April 9, 2021, Ratajczak never contacted the Beckers to inform them that he had either issued a violation notice against PPN or what specific ordinance violation Ratajczak had cited against PPN or members of the Shaw family.

**Tom Becker's April 9, 2021, Letter to Roedl and Ratajczak**

273.    On April 9, 2021, unaware that PPN had been cited, Tom Becker sent Roedl e-mail correspondence, and copied Ratajczak, raising Ratajczak's March 25, 2021, statement that he was having difficulties finding a violation to cite against PPN.

43

274.     Tom Becker wrote: "Yesterday, we received a response to our County FOIA request indicating that there were no permits issued to the Possibility Place Nursery prior to its 2017 re-excavation and enlargement of its retention basin.  It is undisputed that this location is in an isolated wetland, based on the February ACOE Chicago District commentary, and that County aerial maps evidence the 2017 excavation activity."

275.     Tom Becker sent Roedl and Ratajczak a sampling of 11 Will County Code ordinances that PPN had violated over the past three years.

276.     Tom Becker further emphasized that "it has been two weeks, and we have yet to receive any notification as to whether a violation notice has been issued, who is handling our complaint at the engineering department, or when an on-site inspection will be scheduled.  The Spring rains are now here, and the basin continues to flood from four separate locations into our farm.  Every single day our forest is saturated and established trees die, our pasture swale is overwhelmed, and the floodplain at the Western edge of our property erodes.  Moreover, hundreds of understory trees and bushes, originally present in the forest, have already died in the last three years, due to the anaerobic conditions created by the flooding from the nursery."

277.     Moreover, Tom Becker said: "This is now the third year that we are prevented from accessing one-half of our farm.  We are at a loss to understand why this situation is not being prioritized.  Given the nursery's refusal to voluntarily correct the flooding, and given Mr. Ratajczak's referral to engineering, please update me as to the steps being taken by the County to address our complaint."

278.     On April 12, 2021, Community Development Division Director Tim Mack

44

wrote an e-mail to Tom Becker and stated: "Good afternoon Mr. Becker. I received the email you sent into Nicole/Greg later Friday afternoon regarding your flooding complaint. Some of the key parties have been out of the office but will be returning in the next few days. We will discuss the circumstances surrounding your complaint internally and will provide you an update by the end of the week. If you have any questions, don't hesitate to contact me."

279.    On April 12, 2021, Tom Becker responded to Mack: "Thank you for your prompt reply. If an engineer would like to meet with us to view the five locations of flooding from the nursery basin, please let us know. Also three weeks ago, the nursery attempted to stop the water dumping from the middle of the basin wall. That area has begun leaking again. We look forward to hearing from your department."

280.    Sometime between March 26, 2021, and April 15, 2021, Ratajczak withdrew the corrective action he had listed in his violation notice requiring the Shaw family to reconnect the diverted field tile and instead allowed Connor Shaw and PPN to hire and pay for its own engineer to write up a drainage report for the Shaw family.

281.    Between March 26, 2021, and April 15, 2021, Ratajczak's violation log does not list either a personal meeting at PPN or a single conversation between Ratajczak and any member of the Shaw family or the Will County Land Use Department indicating who authorized Connor Shaw to hire his own engineer, instead of the matter being handled by Will County engineering.

282.    On or before April 15, 2021, the date listed for corrective action in the violation letter, Defendant Shaw Family Trust did not "[r]emove the diverted field tile, that drains into the pond, and reconnect the diverted field tile to the previous field tile

45

where the diverted field tile came from."

283.    On April 15, 2021, Ratajczak's violation log noted that he met Tristan Shaw at PPN who informed Ratajczak that their Professional Engineer would be coming to view the site on April, 19, 2021.

**Greg Ratajczak's April 15, 2021, Meeting with Steve, Tom, and Jeff Becker**

284.    On April 15, 2021, Greg Ratajczak met with Steve, Tom, and Jeff Becker at their property, and they showed him the wide stream in their pasture swale dividing the Becker property in two, as well as the water flooding at the western edge of the Becker property, which was approximately 900' from the PPN pond.

285.    On April 15, 2021, Ratajczak's violation log noted that Ratajczak informed the Beckers that he had put the Shaws in violation and that he was meeting with the Shaws and their professional engineer on April 19, 2021.

286.    Tom Becker told Ratajczak that the Beckers wanted PPN to provide a wetland delineation, tile survey, and an After Site Development Plan.

287.    In addition, Ratajczak's violation log stated that the Beckers "also want to talk to the P.E. to explain to him how their property was dry before the Shaw's did work on the pond and now they have constant water flow going through their property."

288.    On April 15, 2021, Ratajczak told the Beckers that he could not guarantee that the engineer would meet with the Beckers on their property.

289.    Jeff Becker told Ratajczak he wanted to show him the wetland location where PPN dug a 200' trench through its wetland and dumped huge mounds of dirt near the pond.

290.    Ratajczak told the Beckers he did not need to see anything else.  The

46

Beckers insisted that Ratajczak review the wetland trench as it was on his way up the driveway.

291.    The Beckers pointed out to Ratajczak the PPN wetland filled with abundant cattails, the 200' x 30' pond trench excavated by PPN in 2017, and mounds of landfill in its inventoried wetland.

292.    Ratajczak told the Beckers that the entire area was filled with cattails and that cattails are a wetland species.

293.    On April 16, 2021, Mack wrote Tom Becker and stated: "Good morning Mr. Becker.  I was able to meet with staff this week to discuss this case.  To be clear, Prosperity [sic] Nursery has been put in violation and will be required to make corrections that bring his drainage into compliance with County Codes and Ordinances. The Nursery has been given a specific time frame to make the necessary corrections to become compliant.  If they fail to do so, the case will be forwarded to Adjudication for a judgment to be rendered."

294.    On April 16, 2021, Tom Becker responded to Mack's e-mail:  "Thank you for your prompt update.  We believe there are two principal causes to the ongoing flooding of our farm.  First, Possibility Place Nursery intentionally altered or damaged the existing subsurface drain tile lines to harvest tile water for use in its irrigation system. Second, the nursery's 2017 excavation dredged and filled in the wetland to alter its hydrology and to eliminate its prior use as a huge detention area for overflow from the nursery basin.  We much appreciate your assistance, as we look forward to regaining the use of our farm.  If you have any questions, please feel free to contact me or come by for an onsite visit."

295. On April 16, 2021, Ratajczak's violation log noted that Tristan Shaw texted Ratajczak that the professional engineer would be at the Shaw site on Monday, April 19, 2021.

296. Between April 15, 2021, and April 19, 2021, Ratajczak never contacted the Beckers to set up a meeting with Shaw's engineer for April 19, 2021.

297. On April 19, 2021, the BCA engineer, Donald Wauthier, who was hired by Connor Shaw and PPN, met with Connor Shaw and with Ratajczak for an onsite visit at PPN as a part of BCA's drainage investigation.

298. On April 19, 2021, while conducting his onsite visit at the adjacent PPN, BCA engineer Donald Wauthier did not meet with or speak with the Beckers, did not come onto the Becker farm to observe the flooding, and never took measurements of the volume of tile water discharging onto the Becker farm from PPN.

299. By late Spring 2021, a large, established 30'-tall deciduous wild black cherry tree along the Becker's SE corner and near their driveway, in the region by the PPN pond bank discharge site, died.

300. During the Spring and Summer of 2021, trees and bushes throughout the 1.5-acre bird sanctuary/nature area died due to the anaerobic soil saturation caused by PPN's flooding.

301. During 2021, Tom Becker began his flower business by trialing gift subscriptions to shops and individuals of organically-grown flowers and plants from his gardens to create floral displays delivered throughout the season.

302. On May 4, 2021, Ratajczak's violation log noted: "Connor Shaw called to inform me that his engineer will submit the report to Connor in 7 to 10 days."

303. On May 11, 2021, Ratajczak's violation log stated, "Connor Shaw called to inform me that his engineer submitted a proposal that include[d] a topography of the site, a watershed study, a drainage study of the pon[d] and a study of the utilization of the pond. He informed me that he will accept the proposal and the study and report should be completed by the end of June."

304. Upon information and belief, between May 11, 2021 and July 15, 2021, a span of over two months, Connor Shaw was involved in both writing drafts for the BCA drainage report and editing the content he approved for inclusion within the final BCA drainage investigation report dated July 15, 2021.

**BCA Drainage Investigation Report, Dated July 15, 2021**

305. The BCA drainage investigation report (hereinafter "BCA report") signed by Wauthier on July 15, 2021, was drafted based on a history of the Shaw and Becker properties provided by Connor Shaw.

306. Prior to submitting his BCA report, Wauthier never met or spoke with Beckers, never requested copies of their Land Use complaints, and never made a site inspection on their farm.

307. In the BCA report, Wauthier noted that PPN's small sized, shallow 1.2-acre pond was too tiny to supply the nursery's irrigation needs, which included 8 acres of intensive aerial irrigation and another 25% of drip-irrigation for its nursery trees and bushes.

308. Wauthier stated: "You [Connor Shaw] indicated to us that the groundwater produced by the well is highly mineralized, making it not ideal for irrigation use. Nursery limits use of well water to extent possible."

49

309. Wauthier reported that PPN was limiting use of its highly mineralized well water irrigation system, and, at some point, largely converted its well water irrigation system to a different water source.

310. Wauthier never identified the year or years when PPN began to limit its use of "highly mineralized groundwater" from its well pumps and began supplying its irrigation system with water from subsurface drain tiles.

311. The BCA report omitted material facts, falsified historical data, misrepresented stormwater patterns, mischaracterized critical elements, relied upon outdated data, and violated professional investigative standards in reaching its conclusions.

312. The BCA report was scientifically unsound because it used outdated 2014 GIS topography contours to analyze excavation activities that occurred in 2017.

313. The BCA report misrepresented the stormwater pattern on the PPN and Becker properties.

314. The BCA report failed to identify or even mention two inventoried wetlands existing in the small stormwater pattern in the SE quadrant of Section 13.

315. The BCA report failed to identify PPN's 2017 reconstruction of its pond and dredge and fill into the adjacent wetland.

316. The BCA report falsified the flow of stormwater across the PPN property where PPN is utilizing a fast-track, drain tile conveyance rather than the natural surface flow.

**BCA Report Asserts Subsurface Drain Tile Is Primary Cause of Becker Flooding**

317. In the July 15, 2021, BCA report, Wauthier stated: "An existing small-

50

diameter subsurface drainage tile is located generally parallel to the surface grass waterway that crosses the Nursery property. That subsurface drain tile originates at the stormwater management basin located near the southwestern side of the Subdivision Tract [Waterford Estates Subdivision]. The tile then continues southwest across Parcel B [several 5-acre plots including 25220, 25232, and 25240 S. Harlem Ave., Monee, IL] to the Nursery Tract."

318.     Wauthier continued: "The Subdivision Tract provides a nearly continuous flow of water flowing into the subsurface drain tile. Secondly, the tile is located within a wet and marshy area of Parcel B. Surface ponding of stormwater runoff is in evidence on historical photos of this watershed. These marshy areas would also be a source of nearly continuous flow of water within the subsurface tile system."

319.     Wauthier pointed out: "[t]he subsurface tile system outlets directly into the Nursery pond. As a result, the pond experiences a nearly year-round inflow of water from the subsurface drain tile system. If the irrigation system is not in full operation, it would be expected that the tile flow would pass through the Nursery pond and discharge onto the neighbor's [Becker's] property (Parcel A)."

320.     Wauthier noted, "[d]uring most months of the year we speculate that the tile flow equals or exceeds the maximum pumping capacity of the irrigation system."

321.     Wauthier remarked that "Mr. Becker's primary concern seems to be flow of water onto his property during times when rainfall is not occurring. In our opinion, the primary source of this flow water is the subsurface drain tile."

322.     Wauthier concluded: "A drainage tile of this type can be expected to flow during most days of a typical year. It provides a continuous flow of water into the pond

51

during most days of the year.  This subsurface mutual drainage tile is the most likely

source of dry-day water flow onto the Becker parcel."

323.    Wauthier identified this PPN open subsurface tile as either the "primary

source" or "most likely source of dry-day water flow onto the Becker parcel."

324.    The BCA report failed to identify the year or party who built the open

subsurface drainage tile conveyance from the Waterford Estates subdivision through the

Parcel B/Sullivan wetland to the PPN pond.

**Tom Becker's July 21, 2021, letter to Ratajczak, Roedl, Mack, and Radner**

325.    On July 21, 2021, Tom Becker wrote Ratajczak an e-mail letter noting that

Ratajczak had previously informed him that the Shaw engineer report would be

completed sometime in late June and asked Ratajczak when the PPN report was going to

be submitted.

326.    In his letter to Ratajczak, which was copied to Defendants Roedl, Mack,

and Radner, Becker noted: "The nursery has now admitted using drain tile water as an

irrigation water source, and we believe the business has intentionally damaged or altered

the area subsurface tile system to harvest tile water for its operations.  We have ample

photographic evidence that our entire parcel, adjacent to the nursery, was historically in

agricultural use, without the presence of a tile water stream.  In the mid-1970's, the

nursery basin was no more than a pond in a sheep pasture.  Regardless of whether there is

an old tile line along the northside of this pond, there was no 15 ft. wide stream running

through our farm nor was the pond dumping water from five locations 24 hours a day.  In

fact, there was no nursery irrigation system and we had tractors, combines, and heavy hay

wagons traverse our 20-acre parcel without issue."

327.     On July 22, 2021, Ratajczak sent Tom Becker an e-mail response: "I was informed on 07-22-2021 that the engineering report was mailed on 07-022-2021.  I was informed on 07-22-2021 that I will be notified when the report has been reviewed."

328.     The BCA engineering report was not sent directly from Wauthier to Ratajczak, but was instead first sent to Connor Shaw, before the report was provided to Ratajczak or for Land Use consumption.

329.     Between July 22, 2021, and July 26, 2021, Connor Shaw did not mail, e-mail, fax, or send by private carrier the BCA report to Ratajczak's Will County office in Joliet.

330.      On July 26, 2021, Ratajczak's violation log stated: "I met Connor at the site and received a copy of the "DRAINAGE INVESTIGATION."

331.     On July 26, 2021, Greg Ratajczak, a Will County Code Enforcement manager, drove approximately 80 minutes round trip from Joliet, Illinois to Green Garden Township, Illinois, using taxpayer funds, to personally pick up a 13-page drainage report from the hands of PPN owner, Connor Shaw.

**Ratajczak Closes Drainage Violation against PPN/Connor Shaw within 24 Hours**

332.     On July 27, 2021, Ratajczak's violation log noted: "The report found that Possibility Place Nursery is not liable for any drainage issues to the Becker property.  The report concludes that: (1) There are multiple properties that are required [to] by pass through Possibility Place Nursery and drain onto the Becker's property.  (2) The irrigation system doesn't result in any increased stormwater runoff.  (3) A field tile originates on another property and discharges into the nursery's pond.  (4) The nursery has proper surface drainage for stormwater runoff.  (5) The nursery's use reduces

stormwater runoff onto Becker's property.  (6) The nursery's operation is consistent with standard practices in Illinois and the Illinois Drainage Code.  (7) The Becker's drainage issues are not caused by operations of Possibility Place Nursery.  See REPORT IN EVIDENCE.  This case is closed."

333.    Within 24 hours of receiving the BCA report, Ratajczak, without first obtaining a County engineering determination, closed Becker's complaint code violation case.

334.    On July 28, 2021, Ratajczak sent a formal letter to Connor and Tristan Shaw closing the case against the Shaw Family Trust for the violation of "[d]iverting a field tile into a pond.  Causing damage to adjoining property owner."

335.    On the morning of July 28, 2021, Ratajczak sent an e-mail to Tom Becker to inform him, that he had closed complaint #LU2100114, citing the seven bullet points Ratajczak had listed in his July 27, 2021, violation log.

336.    On July 28, 2021, Tom Becker sent an e-mail letter addressed to Radner, copied to Roedl, Mack and Ratajczak, noting that Beckers had learned that their flooding complaint had been closed, requesting, "we would like to have you schedule a meeting for us in August, preferably with Ms. Roedl, Mr. Mack and a county engineer knowledgeable in stormwater ordinances and drainage engineering requirements, to further review our concerns."

337.    Neither Radner nor anyone from the Will County Land Use Department responded to Tom Becker's e-mail or acted upon his request to schedule a meeting between the Will County Land Use Department, the engineering department, and the Becker family.

338.    On July 28, 2021, Steve Becker filed a FOIA request with Land Use to gain access to "[a]ny and all documents, activity logs, correspondence, and reports - including any engineering or consultant reports submitted by or on behalf of the nursery - pertaining to Case No. LU2100114 against Possibility Placed Nursery/Tristan Shaw/Connor Shaw . . ."

339.    On August 4, 2021, Land Use sent Steve Becker a copy of BCA's July 15, 2021, Drainage Investigation Report.

340.    On September 8, 2021, while clearing dead bushes along the Becker driveway, the Beckers observed, for the second year, PPN water being dumped at approximately 825' north of Monee-Manhattan Road along the Becker driveway, traveling along a 200' ditch.

**September 13, 2021, Letter from Mack Closing Becker Land Use Complaint**

341.    On September 13, 2021, Tom Becker received a letter from Defendant Mack: "Regarding the drainage complaint you filed with the Will County Land Use Department on March 1, 2021.  The Code Enforcement Division performed an initial investigation of the complaint and cited the owner Possibility Place Nursery as in violation of 164.022(A) Stormwater Drainage."

342.    Mack continued: "Upon receipt of this violation notice, the owner of Possibility Place Nursery hired the Professional Engineering firm of Berns, Clancy and Associates to perform a drainage study of the nursery and specifically the portion of the nursery site that drains towards your property.  A complete hydrologic and hydraulic analysis was performed.  The results of these studies indicates that neither the properly operated irrigation system on the site or the pond adjacent to your property increase the

55

total volume of flow, nor the peak rate of flow onto your property. In addition, the review identified that a significant portion of the stormwater runoff flowing onto your property originates from another property in the watershed. While Possibility Nursery must pass the runoff flows through its lands, it is not required to detain or retain that stormwater runoff."

343. All of the factual findings cited by Mack in his September 13, 2021, letter, were lifted directly from passages submitted in the BCA report, some extracted word for word.

344. The findings cited by Mack were false, misleading, or inaccurate.

345. On September 13, 2021, Mack stated: "The Development Services Division's engineering staff and the Department's consulting professional engineer reviewed the report. They also conducted their own analysis of the drainage patterns of the area in question and concur with the conclusions drawn by Berns, Clancy and Associates. Therefore, the Code Enforcement Division of the Will County Land Use Department concludes that there is insufficient evidence of any violation of County Code/Ordinances pertaining to the drainage complaint raised and has sent a letter of compliance to the owner of Possibility Nursery and closed case 21LU00114CE."

346. No scientific or substantive independent investigation was conducted by the Will County Land Use Department or its professional engineer.

347. Neither Defendant Killinger nor anyone from the Will County Land Use Department's engineering staff visited the Becker property, met with the Beckers, or documented or conducted tests on the Becker's property.

348. Neither Defendant Killinger nor anyone from the Will County Land Use

56

Department's engineering staff visited PPN's property, documented, surveyed, or conducted tests on PPN's property, or investigated dredge and fill activities in PPN's inventoried wetland.

349.     On September 15, 2021, the Beckers observed that the 25'-tall, 25-year-old white pine tree, which the Beckers had planted with their mother at the entrance of the Becker farm, was dead.

350.     On September 24, 2021, and again on September 28, 2021, surface water was being discharged by PPN along the Becker driveway at approx. 825' north of Monee-Manhattan Road, with pools of water at the base of their driveway bushes and trees.

**Jeff Becker's October 30, 2021, Letter to Tim Mack regarding BCA Report**

351.     On October 30, 2021, Jeff Becker e-mailed a 24-page letter to Defendant Mack, which was copied to Defendants Roedl and Radner, in which he wrote: "[W]e find your staff's decision directly contradictory to the relevant findings in the report and legal authority, and can only wonder if anyone actually read it.  The BCA investigation itself not only supports our contention that the "primary" source of water being dumped on our property is from a subsurface open drain tile on the Nursery property (BCA P. 12, Para. 3, P. 8, Paras. 2-5), but provides further factual admissions and evidence relating to necessary follow-up investigation by the Will County Land Use engineering staff."

352.     Jeff Becker further stated: "Remarkably, the BCA engineer completely fails to list when this open subsurface drainage tile was built or by whom, and those two facts are essential.  If, e.g., this tile line was laid between 1930-1957 (before the Shaws moved to their property), then the Beckers, who moved to their farm in 1974, should have been experiencing these identical 8+ month-long water drainage problems

57

(October/November-July) every single year. Yet, no such water issues from the Shaw land, splitting the Becker's property in two, existed prior to 2018."

353.    Jeff Becker's letter furnished Mack, Roedl, and Radner with extensive documentary evidence identifying information that Wauthier had omitted from his BCA report, including that the subsurface drain tile outletting at the PPN pond was illegally tiling water from a protected wetland in the PPN stormwater watershed pattern.

354.    In this regard, Jeff Becker wrote, "concerning these 62 acres of rainfall watershed from Shaw's neighbors, the Nursery likely constructed this tile line to bypass the watershed's 1/4- mile trek across its own hydric soils. Of course, it is an illegal water conveyance for a land owner, like Shaw, to alter the historic watershed pattern from infiltrating and dissipating across his own land but instead dump, via tile line, that same stormwater flow onto his neighbor's doorstep."

355.    Jeff Becker reiterated to Mack, Roedl, and Radner that Wauthier's two admissions that the subsurface drain tile entering into the PPN pond was either the "primary source" or "most likely source of dry-day water flow onto the Becker parcel", provided Land Use with clear evidence that PPN was committing a drainage ordinance violation.

356.    Jeff Becker provided Mack with a list of ten relevant and rudimentary questions to answer, as well as the options of setting up a meeting to discuss the matters in Becker's letter or to conduct on onsite visit at the Becker farm.

357.    Jeff Becker concluded his letter to Mack as follows: "Please inform us if our complaint is going to remain closed based on your 9/13/21 finding of "insufficient evidence", or due to the additional facts/aerial photos/evidence we have provided in this

58

response, our complaint is going to be reopened and actually investigated by the Will County Land Use Engineering staff."

358. On October 31, 2021, within 24 hours of Jeff Becker's letter to Mack and Land Use, PPN tile water discharge sites once again began dumping into the Becker farm and continued 24 hours a day, seven days a week until June 2022.

359. On November 22, 2021, Mack wrote an e-mail to Radner stating: "On a side note, is Scott [Killinger] going to be in much between now and the end of the Fiscal Year next Tuesday?  I was just circling back to that letter received from the Becker's about Possibility Place Nursery.  At some point we'll probably need to respond, even if it is simply that our PE and staff still concur with the findings in the report."

360. Just prior to Thanksgiving, November 25, 2021, Mack provided Killinger with a copy of Jeff Becker's October 30, 2021, letter for review.

361. On December 1, 2022, Mack wrote an e-mail to Ratajczak, with an attachment of Jeff Becker's October 30, 2021, letter, and stated: "Greg, I received this response letter prior to Thanksgiving from Jeff Becker (Tom Becker's brother).  He apparently went through the BCA report provided by Mr. Shaw and parsed it point by point.  I gave Scott a copy just prior to Thanksgiving to review.  Before I respond back to him, please review and I'll schedule a meeting with you/Scott/Brian to discuss for the end of the week or early next week.  Materially, I'm not certain this changes anything. However, I'm not the expert on the matter.  You have firsthand knowledge from your investigation and Scott's our staff PE.  Before responding, I want to make sure we all concur with an appropriate response.  Let me know when you think you'll be able to review so I can set up the meeting.  Thanks."

362.    As of December 1, 2021, Defendants Mack, Roedl, Radner, Killinger, and Ratajczak had all received copies of Jeff Becker's October 30, 2021, letter detailing omissions, deceptions and contradictions made in the BCA report.

363.    On January 11, 2022, Mack sent an e-mail to Killinger and Ratajczak with a copy to Roedl, along with an attachment of Jeff Becker's October 30, 2021, letter, with the subject line: "Canceled - Possibility Place Nursery - Review", "Importance: High", wherein Mack stated: "[w]e need to get together to discuss Mr. Becker's response and ensure we're on the same page should any future litigation arise. In the interim, have a great start to the New Year. – Tim."

364.    Sometime between late November, 2021, and March 23, 2022, Killinger reviewed Jeff Becker's October 30, 2021, letter and wrote marginalia, many illegible, with various questions and comments.

365.    Killinger's written comments indicate a lack of even the most-basic familiarity with the facts underlying the Beckers' complaints.

366.    For example, on pages 8 and 9 of Becker's October 2021 letter, Killinger inquires as to records about the open subsurface drain tile running between the inventoried Parcel B/Sullivan wetland and Shaw's pond and whether tile work on AG was permissible.

367.    On the bottom of page 11 of Becker's October 2021, letter, Killinger underlined: "In sum, it is now clear that Connor Shaw, an educated hydrologist, is knowingly destroying two different wetlands, both present in his quadrant's watershed...."

368.    In 2022, Tom Becker formalized his flower business as "The Bavarian

60

Flower Farm", offering subscriptions to retail shops and individuals for organic floral bouquets delivered throughout the flower season.

**PPN Pond Excavations in 2022**

369.    On March 17, 2022, the first Spring day dry enough to use heavy equipment for construction, a PPN New Holland front-end loader moved substantial mounds of dirt and gravel near the SE corner of the PPN pond, the very site where the BCA report claimed PPN's open subsurface line entered the PPN pond.

370.    On March 18, 2022, within 24 hours of PPN's construction activities along the SE side of the PPN pond, water began discharging from the west bank pond wall into the Becker farm.

371.    Between October 30, 2021, and March 20, 2022, Defendant Mack never responded to Jeff Becker's October 30, 2021, letter.

372.    As a result of the new excavation activity at the PPN pond, on March 20, 2022, Jeff Becker wrote Defendant Mack an e-mail, copied to Roedl and Radner, requesting that Mack inform the Beckers whether "our complaint was going to be reopened and properly investigated by the Will County Land Use engineering staff."

373.    Therein, Jeff Becker noted that "for the past several years, my brother had planned on clearing invasive bushes/trees and then tilling portions of our farm for his new agricultural pursuit of transforming acreage of our land into a flower farm business. Specifically, due to the illegal transport flow of subsurface tile water from the Nursery, he has been prohibited from using any farm equipment/vehicles on half of our land in the critical Spring and early Summer months.  Thus, Greg Ratajczak and now the Will County Land Use Department's failure to investigate or follow it own ordinances, is

clearly benefitting the politically-connected agricultural business, Possibility Place Nursery, while simultaneously damaging my brother's agricultural business, The Bavarian Flower Farm, which officially began operation last year."

374.    Jeff Becker also informed Mack of PPN's excavation with a PPN front-end loader near the SE corner of their pond.

375.    On March 20, 2022, Jeff Becker asked Mack whether PPN had obtained the proper site development permits or wetland delineation for its current excavation at this wetland pond location.

376.    Jeff Becker concluded: "In sum, we have a former Will County Board member who, for profit, has manipulated the local watershed, drained a large neighboring wetland pond, trenched and altered the form and detention of his own pond and adjacent wetland, is illegally conveying millions of gallons of tiled water under his land for his Nursery's seasonal use, and then directing that tiled water flow into our farm. But due to political favoritism based on the identity of the violator, Will County continues to refuse to follow its own ordinances and is now essentially complicit in allowing the damage to continue."

377.    On March 21, 2022, Radner wrote an e-mail to Mack and stated: "Mr. Becker is alleging that there had been some additional digging that took place last week." Mack responded, "I'll have Greg go out and investigate the new claim. I will respond to Mr. Becker and cc you on it."

378.    On March 23, 2022, Mack wrote Ratajczak: "At some point this week, take a ride out to Possibility Place Nursery to see if they're doing any unpermitted excavating. The Beckers are claiming he's doing a bunch of excavation which started on

62

3/17.  I understand that even if they are, it may be permissible within the ordinance depending on what they're doing.  If they are doing something that isn't, then they'll be cited like anyone else."

379.    On March 23, 2022, Mack wrote Jeff Becker, with copies to Radner, Roedl, and Ratajczak, the following: "Good afternoon Mr. Becker.  With regards to the attached letter, Code Enforcement Case 21LU0014 - Possibility Place Nursery was and remains closed due a lack of sufficient evidence to support the complaint.  Prior to closing this case, the County's Professional Engineer [Killinger] reviewed all evidence gathered for the case and concurred with this action."

380.    Mack further stated: "Regarding any potential new excavation being undertaken by the nursery, the Land Use Department will investigate and determine if the activities taking place fall within the scope of permissible work subject to the County's Stormwater ordinance.  If they are not, the owner will be cited in violation and required to obtain all the necessary permits to proceed with such work."

381.    On March 24, 2022, Roedl responded to Mack's e-mail to Jeff Becker and stated: "Love this, Tim.  Straight and to the point.   Otherwise, I have a feeling that we are going to continue to get random updates from Mr. Becker for the entirety of our remaining time in this office . . . ."  Roedl then added a happy face emoji.

382.    On March 24, 2022, Ratajczak opened up a surface water drainage case 22LU00166, Attn: Cynthia Jo Connor B III Shaw, Shaw Family Dec Trust, and failed to identify Possibility Place Nursery as the violator.

383.    On March 24, 2022, Ratajczak wrote in his violation log: "First of all, the pond was built over 50 years ago specifically for irrigation purposes.  Over the years the

pond became an inventoried wetland."

384. On March 24, 2022, Ratajczak's violation log described his investigation as follows: "I entered the Becker's driveway to inspect the pond. I saw Possibility Nursery planting rows of saplings south of the pond. I didn't see any excavation taking place near or around the pond. See pictures in evidence. There aren't any violations. This case is closed."

385. Ratajczak's March 24, 2022, investigation did not include a site inspection of the PPN property at the wetland near the pond, nor did it include a conversation with a PPN employee.

386. Although parking on the Becker's driveway, Ratajczak did not come to the Becker's home to speak with them or request photos of the excavation work and its location.

387. On March 27, 2022, Jeff Becker wrote Defendant Mack: "Given that these Nursery activities are in complete violation of Will County's wetland and Water Resource Ordinances, our only question now is to determine what actions, if any, you, Land Use or Code Enforcement have taken in the past five months after receiving our October 2021 letter."

388. Jeff Becker further noted: "Alternatively, if you and/or Land Use have made the decision to forego an investigation into the Nursery's activities damaging the local watershed, despite the new evidence we presented, please inform us of that decision, so that we can proceed with the appropriate steps to restore our farm to its former condition, so that my brother can use our property for his floral agricultural business."

64

389.    Defendant Mack never responded to Jeff Becker's March 2022 letter.

390.    On March 30, 2022, Mack sent David Dubois, Department Director of the Land Use Department, the following e-mail: "David, per our conversation, attached are the letters from Mr. Becker from 10/30/21 and this past Sunday, 3/27/21 [22]."

391.    On April 11, 2022, a PPN front-end loader made numerous trips into the interior of PPN, before returning with dirt and gravel.  This was a continuation of the March 17, 2022, construction activities near the SE corner of the PPN pond and located in its surrounding wetland.

392.    Upon information and belief, the March 17, and April 11, 2022, excavations were performed for the purpose of removing evidence in anticipation of litigation.

393.    On April 11, 2022, Steve Becker filed a series of FOIA requests with the Will County Land Use Department to obtain documents regarding PNN and actions taken by various members of the Will County Land Use Department.

394.    In Spring 2022, water continued to discharge into the Becker farm from five different locations.

395.    On April 29, 2022, an excavator operated at the top of the SW side of the PPN pond wall removing dirt from the exact location on the pond wall where the Beckers had previously identified a discharge site, approximately 4' high, that had dumped water into the Becker bird sanctuary/nature area since 2018.

396.    On April 29, 2022, an excavator operated at the top of the SW side of the PPN pond, digging a huge mound of dirt out of the pond wall bank and dumping it along the top of the pond rim.  This was above the precise pond location where a discharge site

had been located.

397.    On April 29, 2022, after an extended break, the excavator began to refill the location with the same dirt it had previously excavated at this water discharge site.

398.    Upon information and belief, on April 29, 2022, PPN removed a riser or discharge pipe it had installed in 2017 in PPN's pond wall.

399.    On May 11, 2022, David Dubois, the acting Department Director in charge of the Will County Land Use Department, sent Steve Becker responses to the majority of Becker's FOIA requests.

400.    On May 13, 2022, Steve Becker wrote an e-mail to Dubois: "Thank you for the FOIA responses, which I have downloaded.  Upon review, I noticed that there are no documents responsive to FOIA Requests 8 and 18.  Is this due to an inadvertent omission, because there are no responsive documents, or because you are asserting an exemption(s)?"

401.    On May 13, 2022, Dubois responded to Steve Becker's e-mail: "Regarding FOIA #18, the Department does have information for a site development permit that was inadvertently omitted in the FOIA response.  The Department will review that document for release by COB May 18."

402.    On May 18, 2022, Dubois sent Steve Becker a dropbox including 70 pages of documents responsive to FOIA request #18, which included records pertaining to the Will County Land Use Department's 2012 wetland violation case against landowner, Denis Sullivan (PIN #1813134000220000) concerning an inventoried wetland, adjacent to the PPN property, in the stormwater drainage pattern at issue in the Becker complaints.

403.    In July 2022, more established trees died in the Becker 1.5-acre bird

sanctuary/nature area, including a 60' alder tree, a large 35' wild black cherry tree, and two 30' maple trees.

404.     In addition, portions of the forest floor previously dry were soggy and saturated, despite no rain and a Summer drought.

## COUNT I
(PROCEDURAL DUE PROCESS – All Defendants)

405.     Plaintiffs incorporate by reference paragraphs 1-404.

406.     The Fourteenth Amendment to the United States Constitution guarantees that no State shall "deprive any person of life, liberty or property without due process of law." U.S. Constitution, amend. XIV.

407.     The Plaintiffs possess a protected property interest in their land under the Due Process Clause of the Fourteenth Amendment.

408.     While acting under color of state law, individually, jointly, and in conspiracy, the Defendants, through their actions and omissions, deprived the Plaintiffs of their property interest.

409.     The Defendants deprived the Plaintiffs of due process of law by failing to provide notice, a fair and prompt pre-deprivation hearing, and other recognized procedural safeguards.

410.     State law remedies are inadequate in this case because the Defendants have effected an illegal taking for purely private purposes thereby bypassing formal eminent domain procedures; accordingly, the Plaintiffs cannot utilize inverse condemnation to seek compensation because, under Illinois law, an inverse condemnation action applies to only two categories of regulatory takings – neither of which occurred herein.

411.     Defendants' willful and wanton conduct was extreme and outrageous.

412.     Each of the individual Defendants was personally involved in depriving Plaintiffs of due process of law.

413.     Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT II
### (TAKINGS CLAUSE – All Defendants)

414.     Plaintiffs incorporate by reference paragraphs 1-404.

415.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

416.     The Takings Clause contained in the Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation."  U.S. Constitution, amend. V.

417.     The Fifth Amendment applies to the States pursuant to the Fourteenth

Amendment to the United States Constitution.

418.    A purely private taking violates the public use requirement, serves no legitimate purpose of government, and is void.

419.    While acting under color of state law, individually, jointly, and in conspiracy, the Defendants, by their actions and omissions, and for purely private use, physically invaded, facilitated, or otherwise contributed to the continuation of the physical invasion of Plaintiffs' private property and/or radically interfered with the Plaintiffs' use and enjoyment of their property by recurrent floodings.

420.    The recurrent floodings occur from between eight to eleven months a year.

421.    The recurrent floodings began in 2018 and continue to the present.

422.    The recurrent flooding is so severe that it severs the Plaintiffs' property in two by a large stream that prevents the Plaintiffs from meaningful access to the use of more than half of their property.

423.    The recurrent flooding enters the Plaintiffs' property from the Defendant PPN's parcel from at least six different locations.

424.    The recurrent flooding has destroyed a unique, natural bird sanctuary by destroying numerous mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems.

425.    The recurrent flooding, which includes pollutants and chemicals, has altered the character of Plaintiffs' property to such an extent that Plaintiffs can no longer claim an "organic" status for their property, a designation they have scrupulously maintained through best practices for nearly a half a century;

426.     The recurrent floodings have dramatically decreased the monetary value of Plaintiffs' property because more than half of the parcel is cut off from the remainder of the land by the large stream formed from the continuous water flow, and, as a result, the property, in its current condition, is unsellable.

427.     In addition, the recurrent flooding has damaged the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

428.     The character of the land at issue is agricultural in nature and has been maintained organically for almost five decades.

429.     Plaintiffs' reasonable investment-based expectation has been to utilize the land for the expansion of The Bavarian Flower Farm, but, due to the fact that more than half of Plaintiffs' property is cut-off from meaningful usage during most of the year due to the recurrent flooding, Plaintiff The Bavarian Flower Farm has been prevented from using the property for this purpose.

430.     The Defendants' physical invasion, facilitation, or contribution to the continuation of the physical invasion of Plaintiffs' private property and/or radical interference with the Plaintiffs' use and enjoyment of their property by recurrent floodings is intentional.

431.     The Plaintiffs have made repeated complaints to Defendants for a period of four years about the destructive impact of the recurrent flooding on their property.

432.     Based upon Plaintiffs' persistent complaints about the destructive impact of the recurrent flooding on their property, the invasion and its continuation were a reasonably foreseeable result of authorized governmental action and/or deliberate

70

inaction in refusing to order corrective measures to be taken.

433.    Defendants' willful and wanton conduct in effecting a taking for purely private use was extreme and outrageous.

434.    Defendants' actions and omissions deprived the Plaintiffs of their constitutional right to just compensation for the taking of their property.

435.    Each of the individual Defendants was personally involved in depriving Plaintiffs of just compensation.

436.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

**COUNT III**
(*Monell*: EQUAL PROTECTION –
Defendant Will County Land Use Department)

437.    Plaintiffs incorporate by reference paragraphs 1-404.

438.    The Fourteenth Amendment to the United States Constitution provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of

71

the laws." U.S. Constitution, amend. XIV.

439.    The Defendant has a policy, custom, or practice of ignoring code enforcement violations for political or pecuniary reasons, of failing to enforce the stormwater and wetland codes when it is inconvenient for politically connected violators, and of selectively enforcing or ignoring such code enforcement violations with the effect of depriving Plaintiffs of their Fourteenth Amendment rights.

440.    For example, as detailed above, the Defendant, through its employees, aggressively enforced stormwater and wetland code violations against Denis Sullivan, whose property is directly adjacent to and located in the same stormwater pattern and land quadrant as Defendant Connor Shaw, whereby Mr. Sullivan was forced to expend in excess of $90,000 to restore the damaged wetland and watershed property, but the Defendant, through its employees, ignored open and much-more egregious wetland and watershed code violations committed by Defendants Connor Shaw, Tristan Shaw, Kelsay Shaw, and PPN, because of Connor Shaw's former position as a Will County Board Member and his current political and pecuniary connections through Defendant County of Will and other related government, municipal, and conservation entities by means of lucrative financial contracts and relationships.

441.    While acting under color of state law, individual employees of the Defendant perpetrated unconstitutional conduct against the Plaintiffs.

442.    The unconstitutional conduct was the result of the aforementioned municipal policy, custom, and practice.

443.    The unconstitutional actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages

for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT IV
### (*Monell*: RATIFICATION: DELEGATION OF AUTHORITY – Defendant Will County Land Use Department)

444.    Plaintiffs incorporate by reference paragraphs 1-404.

445.    Defendant Tim Mack is the Director of the Department's Community Development Division, the final policymaker for the Division, and the direct supervisor of the Department's Code Enforcement Unit.

446.    Defendant Mack, as the Defendant's policymaker, ratified the decision of Defendant Ratajczak, the Manager of the Division's Code Enforcement Unit, to delegate the authority of investigating code enforcement violations committed by Defendants PPN, Connor Shaw, Tristan Shaw, and Kelsay Shaw, to a paid engineer selected and hired by the Defendant violators themselves, thereby depriving the Plaintiffs of any independent and neutral investigation to be conducted by the county engineer or any input or feedback into the investigatory process.

447.     Defendant Ratajczak then closed the code enforcement complaint based on the predictable conclusion of the violators' expert, and the Defendant refused to take promised corrective action against the violators without conducting any independent investigation into Plaintiffs' persistent complaints of massive flooding violations.

448.     While acting under color of state law, individual employees of the Defendant perpetrated unconstitutional conduct against the Plaintiffs.

449.     The unconstitutional conduct was the result of the aforementioned ratification by the Defendant's policymaker.

450.     The unconstitutional actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## **COUNT V**
### (STATE CLAIM – TAKINGS CLAUSE: TAKING – All Defendants)

451.     Plaintiffs incorporate by reference paragraphs 1-404.

452.     The Plaintiffs maintain an actual and exclusive possessory interest in their

74

property.

453.    The Takings Clause of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law.  Such compensation shall be determined by a jury as provided by law." Illinois Constitution, Article 1, § 15.

454.    A purely private taking violates the public use requirement, serves no legitimate purpose of government, and is void.

455.    While acting individually, jointly, and in conspiracy, the Defendants, by their actions and omissions, and for the purely private use of Defendants PPN, Connor Shaw, Tristan Shaw, and Kelsay Shaw, physically invaded, facilitated, or otherwise contributed to the continuation of the physical invasion of Plaintiffs' private property and/or radically interfered with the Plaintiffs' use and enjoyment of their property by recurrent floodings.

456.    The recurrent floodings occur from between eight to eleven months a year.

457.    The recurrent floodings began in 2018 and continue to the present.

458.    The recurrent flooding is so severe that it severs the Plaintiffs' property in two by a large stream that prevents the Plaintiffs from meaningful access to the use of more than half of their property.

459.    The recurrent flooding enters the Plaintiffs' property from the Defendant PPN's parcel from at least six different locations.

460.    The recurrent flooding has destroyed a unique, natural bird sanctuary by destroying numerous mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees'

root systems.

461.     The recurrent flooding, which includes pollutants and chemicals, has altered the character of Plaintiffs' property to such an extent that Plaintiffs can no longer claim an "organic" status for their property, a designation they have scrupulously maintained through best practices for nearly a half a century;

462.     The recurrent floodings have dramatically decreased the monetary value of Plaintiffs' property because more than half of the parcel is cut off from the remainder of the land by the large stream formed from the continuous water flow, and, as a result, the property, in its current condition, is unsellable.

463.     In addition, the recurrent flooding has damaged the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

464.     The character of the land at issue is agricultural in nature and has been maintained organically for almost five decades.

465.     Plaintiffs' reasonable investment-based expectation has been to utilize the land for the expansion of The Bavarian Flower Farm, but, due to the fact that more than half of Plaintiffs' property is cut-off from meaningful usage during most of the year due to the recurrent flooding, Plaintiff The Bavarian Flower Farm has been prevented from using the property for this purpose.

466.     The Defendants' physical invasion of Plaintiffs' private property and/or radical interference with the Plaintiffs' use and enjoyment of their property by recurrent floodings is intentional.

467.     The Plaintiffs have made repeated complaints to Defendants, including

Defendant Will County Land Use Department and its Defendant employees, for a period of four years about the destructive impact of the recurrent flooding on their property.

468.    Based upon Plaintiffs' persistent complaints about the destructive impact of the recurrent flooding on their property, the invasion and its continuation were a reasonably foreseeable result of authorized governmental action and/or deliberate inaction in refusing to order corrective measures to be taken.

469.    Defendants' willful and wanton conduct was extreme and outrageous.

470.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT VI
### (STATE CLAIM – TAKINGS CLAUSE: DAMAGES – All Defendants)

471.    Plaintiffs incorporate by reference paragraphs 1-404.

472.    The Plaintiffs maintain an actual and exclusive possessory interest in their property.

473.    The Takings Clause of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law.  Such compensation shall be determined by a jury as provided by law." Illinois Constitution, Article 1, § 15.

474.    A purely private taking violates the public use requirement, serves no legitimate purpose of government, and is void.

475.    While acting individually, jointly, and in conspiracy, the Defendants, by their actions and omissions, and for the purely private use of Defendants PPN, Connor Shaw, Tristan Shaw, and Kelsay Shaw, physically damaged, facilitated, or otherwise contributed to the continuation of the physical invasion of Plaintiffs' private property and/or radically interfered with the Plaintiffs' use and enjoyment of their property by recurrent floodings.

476.    The recurrent floodings occur from between eight to eleven months a year.

477.    The recurrent floodings began in 2018 and continue to the present.

478.    The recurrent flooding is so severe that it severs the Plaintiffs' property in two by a large stream that prevents the Plaintiffs from meaningful access to the use of more than half of their property.

479.    The recurrent flooding enters the Plaintiffs' property from the Defendant PPN's parcel from at least six different locations.

480.    The recurrent flooding has destroyed a unique, natural bird sanctuary by destroying numerous mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems.

481.     The recurrent flooding, which includes pollutants and chemicals, has altered the character of Plaintiffs' property to such an extent that Plaintiffs can no longer claim an "organic" status for their property, a designation they have scrupulously maintained through best practices for nearly a half a century;

482.     The recurrent floodings have dramatically decreased the monetary value of Plaintiffs' property because more than half of the parcel is cut off from the remainder of the land by the large stream formed from the continuous water flow, and, as a result, the property, in its current condition, is unsellable.

483.     In addition, the recurrent flooding has damaged the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

484.     The character of the land at issue is agricultural in nature and has been maintained organically for almost five decades.

485.     Plaintiffs' reasonable investment-based expectation has been to utilize the land for the expansion of The Bavarian Flower Farm, but, due to the fact that more than half of Plaintiffs' property is cut-off from meaningful usage during most of the year due to the recurrent flooding, Plaintiff The Bavarian Flower Farm has been prevented from using the property for this purpose.

486.     The Defendants' physical damage of Plaintiffs' private property and/or radical interference with the Plaintiffs' use and enjoyment of their property by recurrent floodings is intentional.

487.     The Plaintiffs have made repeated complaints to Defendants, including Defendant Will County Land Use Department and its Defendant employees, for a period

of four years about the destructive impact of the recurrent flooding on their property.

488.    Based upon Plaintiffs' persistent complaints about the destructive impact of the recurrent flooding on their property, the invasion and its continuation were a reasonably foreseeable result of authorized governmental action and/or deliberate inaction in refusing to order corrective measures to be taken.

489.    Defendants' willful and wanton conduct was extreme and outrageous.

490.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT VII
### (STATE CLAIM – INTENTIONAL TRESSPASS – All Defendants)

491.    Plaintiffs incorporate by reference paragraphs 1-404.

492.    The Plaintiffs maintain an actual and exclusive possessory interest in their property.

493.    While acting individually, jointly, and in conspiracy, the Defendants

intentionally invaded Plaintiffs' exclusive possession and condition of their land.

494. The Defendants wrongfully interfered with and continue to interfere with Plaintiffs' possessory rights by flooding Plaintiffs' property, severing the Plaintiffs' parcel in two by a large stream thereby preventing Plaintiffs from meaningful access to the use of more than half of their property, destroying unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, altering the character of Plaintiffs' property by means of sustained flooding of polluted water, and damaging the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

495. The Defendants' intrusions subtract from the Plaintiffs' use of their property.

496. Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and

attorney's fees.

## **COUNT VIII**
### (STATE CLAIM – NEGLIGENT TRESPASS – All Defendants)

497.    Plaintiffs incorporate by reference paragraphs 1-404.

498.    The Plaintiffs maintain an actual and exclusive possessory interest in their property.

499.    While acting individually, jointly, and in conspiracy, the Defendants negligently invaded Plaintiffs' exclusive possession and condition of their land.

500.    The Defendants wrongfully interfered with and continue to interfere with Plaintiffs' possessory rights by flooding Plaintiffs' property, severing the Plaintiffs' parcel in two by a large stream thereby preventing Plaintiffs from meaningful access to the use of more than half of their property, destroying unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, altering the character of Plaintiffs' property by means of sustained flooding of polluted water, and damaging the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

501.    The Defendants owed a duty of care to Plaintiffs not to interfere with the exclusive possession of their property.

502.    The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

503.    The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

82

504.     The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

505.     The Defendants breached their duty.

506.     Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## **COUNT IX**
(STATE CLAIM – INTENTIONAL NUISANCE – All Defendants)

507.     Plaintiffs incorporate by reference paragraphs 1-404.

508.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

509.     While acting individually, jointly, and in conspiracy, the Defendants intentionally invaded Plaintiffs' interest in the private use and enjoyment of their land.

510.     The Defendants substantially interfered with and continue to substantially interfere with Plaintiffs' use and enjoyment of their land by flooding Plaintiffs' property,

83

severing the Plaintiffs' parcel in two by a large stream thereby preventing Plaintiffs from meaningful access to more than half of their property, destroying unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, altering the character of Plaintiffs' property by means of sustained flooding of polluted water, and damaging the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

511.    The Defendants' intrusions are unreasonable.

512.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT X
(STATE CLAIM – NEGLIGENT NUISANCE – All Defendants)

513.    Plaintiffs incorporate by reference paragraphs 1-404.

514.    The Plaintiffs maintain an actual and exclusive possessory interest in their

84

property.

515. While acting individually, jointly, and in conspiracy, the Defendants negligently invaded Plaintiffs' interest in the private use and enjoyment of their land.

516. The Defendants substantially interfered with and continue to substantially interfere with Plaintiffs' use and enjoyment of their land by flooding Plaintiffs' property, severing the Plaintiffs' parcel in two by a large stream thereby preventing Plaintiffs from meaningful access to more than half of their property, destroying unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, altering the character of Plaintiffs' property by means of sustained flooding of polluted water, and damaging the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

517. The Defendants' intrusions are unreasonable.

518. The Defendants owed a duty of care to Plaintiffs not to interfere with the use and enjoyment of their property.

519. The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

520. The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

521. The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

522. The Defendants breached their duty.

523.     Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT XI
(STATE CLAIM – ADJACENT LANDOWNER LIABILITY –
Defendants PPN, Connor Shaw, Tristan Shaw, Kelsay Shaw,
Shaw Family Dec Trust, and Shaw Family Trust)

524.     Plaintiffs incorporate by reference paragraphs 1-404.

525.     The Plaintiffs maintain an actual and exclusive possessory interest in their property.

526.     The Defendants are the owners of the dominant property adjacent to Plaintiffs' parcel.

527.     While acting individually, jointly, and in conspiracy, the Defendants negligently invaded Plaintiffs' exclusive possession, use, and enjoyment of their property.

528.     The Defendants wrongfully interfered with and continue to interfere with

Plaintiffs' possessory rights, use, and enjoyment of their land by flooding Plaintiffs' property, severing the Plaintiffs' parcel in two by a large stream thereby preventing Plaintiffs from meaningful access to the use of more than half of their property, destroying unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, altering the character of Plaintiffs' property by means of sustained flooding of polluted water, and damaging the Plaintiffs' ingress and egress to their property by undermining the integrity of their driveway by water saturation.

529.    The aforementioned flooding is not a natural condition of the land and/or has been artificially aggravated by the Defendants' use of their land by dramatically altering the historic stormwater pattern on their land, excavating, dredging. and filling in the inventoried wetland adjacent to Plaintiffs' property, which stores hundreds of thousands of gallons of water in its hydric soils, digging into and raising the banks of the existing pond located next to Plaintiffs' property, and transporting, utilizing, and funneling into the existing pond subsurface drain tile water to supply their commercial nursery irrigation system.

530.    The Defendants owed a duty of care to Plaintiffs not to interfere with the exclusive possession, use, and enjoyment of their property.

531.    The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

532.    The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

533.    The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

534.    The Defendants breached their duty.

535.    Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT XII
### (STATE CLAIM – CIVIL CONSPIRACY – All Defendants)

536.    Plaintiffs incorporate by reference paragraphs 1-404.

537.    The Defendants, including the Will County Land Use Department, reached an agreement to either force the Plaintiffs to grant a water easement to PPN or to otherwise take Plaintiffs' property in violation of Article I, §§ 2, 15 of the Illinois Constitution based on politically corrupt motives to impermissibly shield Defendant Connor Shaw, a former Will County Board Member, from liability, protect his family business, Defendant PPN, from citation for multiple county, state, and federal violations

pertaining to wetlands, pollution, subsurface tile usage and conveyance, and stormwater and watershed alterations, as well as hundreds of thousands of dollars in potential fines and restoration costs, and to benefit he, his family, and PPN due to Defendant Shaw's generational connections with regional, county, municipal, and local land use and conservation entities by means of lucrative financial contracts and relationships.

538.     The Defendants committed acts in furtherance of the conspiracy, including taking Plaintiffs' property through sustained and recurrent flooding, damaging Plaintiffs' property through the destruction of unique natural habitats, mature trees, understory trees, bushes, and saplings by prolonged periods of flooding that reduced the oxygen level in the soils and weakened the trees' root systems, trespassing upon Plaintiffs' property by means of sustained flooding of polluted water, creating a nuisance by such flooding thereby depriving the Plaintiffs of the use and enjoyment of their property, inflicting emotion distress upon the Plaintiffs, and engaging in a willful and wanton course of conduct to deprive the Plaintiffs of their rights and property.

539.     The Defendants knowingly and intentionally participated in this common scheme to commit the aforementioned torts.

540.     Defendants' conspiracy directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs' property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs' lifetimes, the destruction of numerous mature trees, understory trees, bushes, and saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of the "organic" status of Plaintiffs' property, the dramatic decrease in the value of Plaintiffs' property and the

inability to sell the parcel due to Defendants' conduct, the economic loss to The Bavarian Flower Farm due to its inability to expand its operations, emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and attorney's fees.

## COUNT XIII
### (STATE CLAIM – WILLFUL AND WANTON CONDUCT – Defendants Mack, Ratajczak, Radner, and Roedl)

541. Plaintiffs incorporate by reference paragraphs 1-404.

542. While acting individually, jointly, and in conspiracy, the Defendants engaged in a course of conduct that showed an actual or deliberate intention to cause harm or which, if not intentional, showed an utter indifference to or conscious disregard for the safety of Plaintiffs' property.

543. The Defendants owed a duty of care to Plaintiffs to protect their property.

544. The injuries would not have occurred but for the Defendants' conduct, and/or the Defendants' course of conduct was a substantial factor in bringing about the complained-of harm.

545. The Defendants' course of conduct created a foreseeable risk of injury to Plaintiffs and their property.

546. The law imposed upon the Defendants an obligation of reasonable conduct for the benefit of the Plaintiffs and their property.

547. The Defendants breached their duty.

548. Defendants' actions and omissions directly and proximately caused the injuries to Plaintiffs and their property, including actual and punitive damages for the illegal taking of Plaintiffs' property, the denial of the use and enjoyment of Plaintiffs'

property, the destruction of a unique, natural bird sanctuary not restorable in Plaintiffs'
lifetimes, the destruction of numerous mature trees, understory trees, bushes, and
saplings, the damage to Plaintiffs' road, the pollution of Plaintiffs' property, the loss of
the "organic" status of Plaintiffs' property, the dramatic decrease in the value of
Plaintiffs' property and the inability to sell the parcel due to Defendants' conduct, the
economic loss to The Bavarian Flower Farm due to its inability to expand its operations,
emotional trauma, mental distress, anguish, and expenditure of personal time in repair,
restoration, and mitigation resulting from Defendants' conduct, and costs, interest, and
attorney's fees.

## COUNT XIV
### (STATE CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – All Defendants)

549.     Plaintiffs incorporate by reference paragraphs 1-404.

550.     While acting individually, jointly, and in conspiracy, Defendants caused
Plaintiffs severe emotional distress by, *inter alia*:

    a.   Preventing the Plaintiffs from the use and enjoyment of their property;

    b.   Destroying a unique, natural bird sanctuary not restorable in Plaintiff's
lifetimes;

    c.   Destroying numerous mature trees, understory trees, bushes, and saplings
by altering the aerobic character of the land;

    d.   Polluting Plaintiffs' land to such an extent that Plaintiffs can no longer
claim an "organic" status for their property, a designation they have
scrupulously maintained through best practices for nearly a half a century;

    e.   Dramatically decreasing the monetary value of Plaintiff's property; and

f.  Rendering Plaintiff's parcel unsellable in its current condition by dividing it in half with continuous water discharge for the majority of the year.

551.  Defendants intended to inflict severe emotional distress or knew that there was a high probability that their conduct would cause severe emotional distress.

552.  Defendants' willful and wanton conduct was extreme and outrageous.

553.  Defendants' actions and omissions directly and proximately caused injuries including but not limited to emotional damage, trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation.

## COUNT XV
(INDEMNIFICATION – Defendant County of Will)

554.  Plaintiffs incorporate by reference paragraphs 1-404.

555.  Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

556.  The Defendants Mack, Ratajczak, Radner, and Roedl are or were employees of the County of Will who acted within the scope of their employment in committing the acts or omissions described herein.

**WHEREFORE,** Plaintiffs demand a jury trial and the following relief jointly and severally against the Defendants:

a.  Actual and compensatory damages in an amount in excess of $1,000,000 to be determined by a jury;

b.  Punitive damages against applicable Defendants in an amount to be determined by a jury;

92

c.      Costs, interest, and attorney's fees under 42 U.S.C. § 1988;

d.      Damages for emotional trauma, mental distress, anguish, and expenditure of personal time in repair, restoration, and mitigation; and

e.      Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Steven W. Becker
Steven W. Becker
Law Office of Steven W. Becker LLC
205 N. Michigan Ave., Suite 810
Chicago, Illinois 60601
(312) 396-4116
swbeckerlaw@gmail.com
Attorney for Plaintiffs