**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO TITLE LAND TRUST COMPANY, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; STEVEN W. BECKER, THOMAS J. BECKER, and JEFFREY C. BECKER, as Beneficiaries of Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089; THE BAVARIAN FLOWER FARM; and TUSCAN HILLS HOMEWONERS ASSOCIATION,<br><br>   Plaintiffs,<br><br>v.<br><br>POSSIBILITY PLACE NURSERY, INC.; CONNOR B. SHAW, III; TRISTAN SHAW; KELSAY SHAW; SHAW FAMILY DEC TRUST; SHAW FAMILY TRUST; COUNTY OF WILL; WILL COUNTY LAND USE DEPARTMENT; DAVID DUBOIS, in his individual capacity; TIM MACK, in his individual capacity; GREG RATAJCZAK, in his individual capacity; BRIAN RADNER, in his individual capacity; ALEX BRUMLEY, in his individual capacity; NICOLE ROEDL, in her individual capacity; SCOTT KILLINGER; BAXTER & WOODMAN, INC.; DONALD WAULTHIER; and BERNS, CLANCY AND ASSOCIATES, P.C.,<br><br>   Defendants. | Case No. 22 C 3875<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

A land trust, the beneficial owners of the land trust, and a homeowner's association bring

this action asserting various claims under 42 U.S.C. § 1983, the Clean Water Act ("CWA"),

*Monell*, and Illinois state law against neighboring landowners, government entities and officials,

1

and other related parties. Essentially, Plaintiffs' 18-count First Amended Complaint ("FAC") (Dkt. 110) alleges that Defendants caused polluted water to flow onto Plaintiffs' property resulting in a *de facto* subsurface water easement and damaged Plaintiffs' property. All defendants have moved to dismiss the FAC for lack of standing and failure to state a claim. (Dkts. 115, 118, 120, 122). For the reasons discussed below, Defendants' motions to dismiss are granted.

## BACKGROUND

The allegations are taken from the FAC and treated as true for purposes of resolving these motions to dismiss. Plaintiff Chicago Title Land Trust Company, as Successor Trustee for LaSalle Bank National Association, as Trustee under Trust Agreement, dated 11/01/94, and known as Trust #119089 (the "Land Trust"), owns a 20-acre parcel of land in Will County, Illinois. (FAC ¶ 5, Dkt. 110). Plaintiffs Steven W. Becker ("Steven"), Thomas J. Becker ("Thomas"), and Jeffrey C. Becker ("Jeffrey"), (collectively, "the Beckers") are the beneficial owners of the property owned by the Land Trust. (*Id.* ¶ 6). This property was originally purchased by the Becker family in 1974, and they have continued to live on and farm the land. (*Id.* ¶¶ 27, 29, 54). Additionally, Plaintiff The Bavarian Flower Farm, a flower bouquet subscription service, operates on the property. (*Id.* ¶¶ 7, 374).

In 1957, the Shaw family purchased an 80-acre property east of the Becker's property. (*Id.* ¶ 36). Presently, Defendant Possibility Place Nursery, Inc. ("PPN") owns 39 acres of the original property, Defendant Shaw Family Dec Trust owns 37 acres, and Defendant Shaw Family Trust owns two acres. (*Id.* ¶¶ 9, 13, 14).

In 1978, Defendant Connor B. Shaw, III ("Connor") and his wife began operating PPN on the Shaw family property. (FAC ¶ 75). Connor is President, Secretary, and an owner of PPN. (*Id.* ¶ 10). Additionally, between 1972 and 2017, Connor served in various roles for the Will County

2

government. (*Id.* ¶ 121). Defendant Tristan Shaw ("Tristan"), Connor's son, is an owner of PPN and in charge of field operations. (*Id.* ¶ 11). Defendant Kelsay Shaw ("Kelsay"), Connor's son, is an owner of PPN and its botanist. (*Id.* ¶ 12).

The 95 acres west of the Beckers' property make up the Tuscan Hills subdivision. (*Id.* ¶ 95). Plaintiff Tuscan Hills Homeowners Association ("Tuscan Hills HOA") is the homeowners' association for the subdivision. (*Id.* ¶ 8). Forked Creek, a tributary of the Kankakee river, sits adjacent to the subdivision. (*Id.* ¶ 90; Ex. A). Below is a map of the relevant property around the time this lawsuit was filed. (*Id.* at Ex. A).



Plaintiffs allege that, in the fall of 2017, PPN undertook a project to alter the height and size of a pond on its property. (*Id.* ¶ 123). Plaintiffs contend that after these alterations, the Beckers began noticing intermittent and unexplained saturation on their property. (*Id.* ¶ 136). Then, in May 2019, the Beckers observed four water discharge sites coming from or near PPN's pond and flowing across the Beckers' property and into the Tuscan Hills subdivision. (*Id.* ¶¶ 138-143).

The Beckers made several complaints to Defendants County of Will ("Will County") and Will County Land Use Department (collectively, the "Department") regarding polluted flowage coming from PPN. (*Id.* ¶ 513). First, Thomas contacted Defendant Brian Radner ("Radner"), the Department's Development Services Division Director, in October 2019 regarding the flowage. (*Id.* ¶¶ 20, 163). Radner referred Thomas to Defendant Greg Ratajczak ("Ratajczak"), Manager of the Code Enforcement Unit. (*Id.* ¶¶ 19, 163). In response, Ratajczak visited the Becker's property on several occasions to investigate. (*Id.* ¶¶ 170, 226, 241, 270). Plaintiffs contend that, during these visits, Ratajczak pressured the Beckers to accept an offer from the Shaw family to pay for a subsurface pipeline to be constructed through the Beckers' property. (*Id.* ¶ 179, 227). Following the investigation, PPN was cited for a maintenance violation, to be corrected by replacing a broken agricultural tile. (*Id.* ¶ 188).

The Beckers submitted a second complaint in February 2021 to Defendant Nicole Roedl, Engineering Technician for the Department. (*Id*. ¶¶ 22, 219). Following an investigation, PPN was cited with a violation for "Diverting a field tile into a pond. Causing property damage to adjoining property." (*Id.* ¶¶ 254, 255). The violation letter indicated that the property needed to be brought into compliance with all Will County codes and ordinances. (*Id.* ¶ 257).

In April 2021, PPN hired Defendant Berns, Clancy & Associates, P.C. ("BCA") and its engineer, Defendant Donald Wauthier ("Wauthier"), to review the issue. (*Id.* ¶ 278). On July 15, 2021, Wauthier issued a report finding that PPN's drainage system was consistent with standard practices in Illinois and the Illinois Drainage Code. (*Id.* ¶¶ 284, 293). But Plaintiffs contend that Wauthier's report was scientifically unsound and falsified information. (*Id.* ¶¶ 286-292).

Defendant Scott Killinger ("Killinger"), who is employed by Defendant Baxter & Woodman, Inc. ("B&W"), an independent contractor hired by Will County, was responsible for

reviewing the Beckers' complaints and Wauthier's report and making independent findings. (*Id.* ¶ 332). Plaintiffs assert that Killinger failed to investigate and make independent findings. (*Id.* ¶¶ 333-338). In September 2021, Defendant Tim Mack ("Mack"), the Department's Finance, Operations, and Community Development Division Director, informed the Beckers that there was "insufficient evidence of any violation of County Code/Ordinances" by PPN. (*Id.* ¶¶ 18, 339, 343). On October 30, 2021, the Beckers sent a letter to Mack challenging those findings. (*Id.* ¶ 351).

Plaintiffs further allege that on March 17, 2022, PPN undertook an excavation project, which caused additional flowage onto the Beckers' property. (*Id.* ¶¶ 382, 383). Thereafter, the Beckers filed another complaint. (*Id.* ¶ 384). Mack responded, indicating that the Department's investigation into PPN remained closed. (*Id.* ¶ 386).

On January 5, 2023, the Beckers filed another complaint regarding new flowage from PPN. (*Id.* ¶ 446). A case was opened and Defendant Alex Brumley ("Brumley"), Engineering Technician for the Department, visited the property to investigate. (*Id.* ¶¶ 21, 453, 454). Brumley determined that there was no evidence of a violation. (*Id.* ¶ 474).

Relatedly, the Beckers filed several FOIA requests seeking to obtain documents related to PPN. (*Id.* ¶ 398). Plaintiffs contend that Defendant David Dubois, the Department's Director, mishandled the FOIA requests. (*Id.* ¶ 403).

The Beckers contend that, as a result of Defendants conduct, they have suffered irreversible damage to the trees and habitats on their property. (*Id.* ¶ 426). Additionally, the Beckers allege that they have incurred costs related to cutting down damaged trees on their property. (*Id.* ¶¶ 431, 437). Furthermore, Plaintiffs allege that the wetland at the Tuscan Hills subdivision has become "channelized and eroded" with polluted water, the backyard of one of the homes in the subdivision

is eroding and buckling, and two lots in the subdivision have been rendered unbuildable. (*Id.* ¶¶ 438, 439).

Accordingly, on July 26, 2022, Plaintiffs filed this lawsuit. After Defendants moved to dismiss the original complaint, but before the Court had an opportunity to rule on the motions, (*see* Dkt. 105), Plaintiffs filed the FAC. Defendants then moved to dismiss the FAC. These motions are fully briefed and ripe for ruling.

## LEGAL STANDARDS

Rule 12(b)(1) allows parties to challenge a pleading based on a lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Courts review standing arguments under Rule 12(b)(1) because standing implicates subject matter jurisdiction. *Smith v. City of Chi.*, 143 F. Supp. 3d 741, 748 (N.D. Ill. 2015). In reviewing a Rule 12(b)(1) dismissal motion based on standing, "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)). The burden of establishing the required elements of standing falls on the party invoking federal jurisdiction. *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015).

Rule 12(b)(6) permits a party to move for dismissal based on a pleading's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether a complaint states a claim under Rule 12(b)(6), courts must accept all non-conclusory factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In addition, the Court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 626 (7th Cir. 2022). Applying these principles, a complaint will survive a motion to dismiss if it "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679 (2009) (citing *Twombly*, 550 U.S. at 556). To state a plausible claim for relief, a complaint must "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679. The movant has the ultimate burden to show that dismissal is warranted. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

## DISCUSSION

Before the Court are four separate motions to dismiss filed by the Land Use Defendants,[1] the Shaw Defendants,[2] the BCA Defendants,[3] and the B&W Defendants.[4] Many of the arguments are the same across the various motions, but others are unique to certain Defendants against whom particular claims are asserted. Viewing the motions altogether, Defendants argue that Plaintiffs claims fail because (1) Tuscan Hills HOA does not have standing, (2) Plaintiffs have not sufficiently alleged federal claims, and (3) the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. Having reviewed the pleadings and considered the parties' submissions and the relevant case law, the Court finds that Tuscan Hills HOA lacks standing and Plaintiffs have not stated a claim under federal law. Because Plaintiffs will be granted

---

[1] The Land Use Defendants refers to Defendants Will County, Will County Land Use Department, Tim Mack, Greg Ratajczak, Brian Radner, Nicole Roedl, David Dubois, and Alex Brumley.

[2] The Shaw Defendants refers to Possibility Place Nursery, Inc., Connor Shaw, Tristian Shaw, Kelsay Shaw, the Shaw Family Dec Trust, and the Shaw Family Trust.

[3] The BCA Defendants refers to Berns, Clancy, and Associates, P.C. and Donald Wauthier.

[4] The B&W Defendants refers to Baxter & Woodman, Inc. and Scott Killinger.

a final opportunity to attempt to amend their complaint in accordance with this ruling, the Court need not yet determine whether Plaintiffs' state law claims should be dismissed at this stage.

## I.    Standing

Article III standing requires a plaintiff to demonstrate (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). "An injury in fact is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) (citing *Spokeo*, 578 U.S. at 339). Here, the Shaw Defendants contend that Tuscan Hills HOA does not have standing because it does not have a legally protected interest that could give rise to an injury in fact. Plaintiffs, however, assert that Tuscan Hills HOA has standing to sue for injuries to the federally protected wetland that is located within the common area of the subdivision. Defendants have the better argument.

In support of their position, the Shaw Defendants rely on *Spring Mill Townhomes Ass'n v. OSLA Fin. Servs., Inc.*, 124 Ill. App. 3d 774 (1st Dist. 1983). There, a townhome association sued the developers for breach of implied warranty of habitability based on defects in the roofs of the townhouses, which were owned by individuals. *Id.* at 775. The association argued that it had standing because the general purpose of its articles and bylaws enabled the association to act with great latitude to serve its members. *Id.* at 779. The court disagreed, finding that the association failed to allege "any injury in its individual capacity to a substantive legally protected interest." *Id.*

*Spring Mill Townhomes* appears to be factually distinguishable, as the Tuscan Hills HOA claims arguably relate to the alleged common areas of Tuscan Hills—not the individual properties. But that is not clear from the FAC, as Plaintiffs also point to damage to particular lots and homes

in the subdivision. Nevertheless, *Spring Mill Townhomes* is instructive as the holding reinforces that a HOA must identify a distinct legally protested interest, as opposed to a generalized interest in protecting its members. *See e.g., DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1239 (N.D. Ill. 2005) ("True, even if you suffer an injury you may not sue unless a legally protected interest of yours has been invaded; that is a rule of standing too. And the commission of a tort or other wrong . . . against a corporation is not the infringement of a legally protected interest of its parent corporation, its shareholders, employees, etc., and so they can't sue to redress it.") (internal citations omitted); *Ekufu v. Iberia Airlines*, No. 12 CV 6669, 2014 WL 87502, at *3 (N.D. Ill. Jan. 9, 2014) (finding that plaintiff did not have a legally protected interest because they were not parties to the agreement at issue).

Here, Plaintiffs' allegations as to Tuscan Hills HOA's standing to sue are very thin. Plaintiffs allege it is an "is an association." (FAC ¶ 8), and that the Tuscan Hills wetland was "preserved in the final subdivision design." (*Id*. ¶ 100). That is it. Critically, Plaintiffs do not state who maintains an ownership interest in the Tuscan Hills wetland. While Plaintiffs contend that it is an "elementary proposition that a homeowners' association controls and manages the common areas of a subdivision[,]" (Resp. to Shaw Defs.' Mot. at 4, Dkt. 125), such conclusory statements do not alleviate the need to allege an ownership interest in such common areas or any other legally sound basis for the Tuscan Hills HOA to pursue these claims. Because the FAC does not show that it suffered an injury in fact, Tuscan Hills HOA has not established Article III standing.

## II.  **Federal Claims**

### A.  **Takings Clause (Count I)**

Plaintiffs assert a violation of the Takings Clause of the Fifth Amendment of the United States Constitution against all Defendants. "[A] government violates the Takings Clause when it

takes property without compensation, and . . . a property owner may bring a Fifth Amendment claim under § 1983 at that time." *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 202 (2019). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017). Furthermore, "[t]o state a claim for a violation of the Takings Clause, a plaintiff must allege (1) that the governmental entity took her property, either through a physical taking or through unduly onerous regulations; (2) that the taking was for a public use; and (3) that, no matter what type of property (real or personal) was taken, the government has not paid just compensation." *Lacy v. City of Chi.*, No. 21 C 06783, 2024 WL 1376211, at *6 (N.D. Ill. Mar. 31, 2024) (citing *Conyers v. City of Chi.*, 10 F.4th 704, 710-11 (7th Cir. 2021)) (internal quotations and alterations omitted). As an initial matter, the Shaw Defendants, the BCA Defendants, and the B&W Defendants argue that Plaintiffs cannot assert a claim under the Takings Clause against them because they were not acting under the color of state law. Additionally, all Defendants argue that Plaintiffs' Taking Clause claim fails because the government was not responsible for the flooding of Plaintiffs' properties. The Court addresses each argument in turn below.

A private person acts under color of state law when he or she is a willful participant in joint action with the State or its agents. *Id*. "This requires evidence of a *concerted effort* between a state actor and that individual." *Id*. (internal quotations omitted) (emphasis in original). "The plaintiff must identify a sufficient nexus between the state and the private actor to support a finding that the deprivation committed by the private actor is fairly attributable to the state." *Id*. (internal quotations omitted). Section 1983 does not, however, punish conspiracy; an actual denial of a civil

right is necessary before a cause of action arises. *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982).

Here, Plaintiffs contend that the Shaw Defendants, the BCA Defendants, and the B&W Defendants were acting under the color of state law because they conspired with the Land Use Defendants to force Plaintiffs to grant an easement to PPN or otherwise take Plaintiffs' property. Defendants, however, argue that Plaintiffs' conclusory allegations do not establish a conspiracy. Even if the Court were to find that Plaintiffs sufficiently alleged a conspiracy, as discussed below, Plaintiffs have failed to state a claim under the Takings Clause; thus, their claim fails as a matter of law.

In this case, Plaintiffs contend that Defendants (1) "attempted to extort a water flowage easement" across the Becker's property, and (2) "engaged in a conspiracy . . . to carry out sham investigations to grant a permanent *de facto* water flowage easement" across the Becker's property. (Resp. to Land Use Defs.' Mot. at 3, Dkt. 126). Plaintiffs asserts that these actions amount to taking an easement without just compensation. Defendants, on the other hand, maintain that the government's response to already existing flooding is not actionable.

Plaintiffs point to three cases in support of their position, but each is readily distinguishable because all involved affirmative conduct *by the government* that caused the flooding or taking of the plaintiff's property. For example, in *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1353 (Fed. Cir. 2003), the court found that increased storm drainage caused by the government's construction of a postal service facility constituted a taking of plaintiff's property. Likewise, in *United States v. Dickinson,* 331 U.S. 745, 748 (1947), the Supreme Court found that the government's building of a dam, which raised the water levels of a river and caused flooding and erosion of the neighboring property, constituted a taking. Finally, in *Nollan v. Cal. Coastal*

*Comm'n*, 483 U.S. 825, 828 (1987), the Supreme Court determined that the government could not condition the approval of plaintiffs' construction permit on the requirement that they allow the public an easement to pass across a portion of their property, unless the government provided just compensation.

The instant case is more analogous to *Billie v. Vill. of Channahon, Ill.*, 58 F.4th 905 (7th Cir. 2023). There, plaintiffs, who owned homes that were flooded by the DuPage River, alleged that the government violated the Constitution by granting permits to build the homes or by failing to construct dikes to keep the water away. *Id.* at 905-06. The Seventh Circuit found the plaintiffs' claims failed because the government "did not take anyone's property, either by physical invasion or by regulation that prevented the land's use." *Id.* at 906. It explained that "the Constitution establishes rights to be free of governmental interference but does not compel governmental intervention to assist persons in distress." *Id*.

The same circumstances exist here. The Land Use Defendants did not cause or authorize the flooding of Plaintiffs' property, and their alleged attempts to encourage the Beckers to allow the Shaws to construct a subsurface water easement do not constitute affirmative conduct by the government that caused the flooding. *See St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1359-60 (Fed. Cir. 2018) (A claim under the Takings Clause "requires the plaintiffs to establish that government action caused the injury to their properties—that the invasion was the 'direct, natural, or probable result of an authorized activity.'"); *Rancho Vista Del Mar v. United States*, 169 Fed. Cl. 299, 304 (2024) ("[A] property loss compensable as a taking *only results* when the asserted invasion is either the direct result of an activity authorized by the government or, alternatively, when the government "intends to invade" the protected property interest.") (internal quotations omitted) (emphasis in original). Even so, Plaintiffs concede that they declined the offer

12

to construct a subsurface pipeline across their property. (*See, e.g.*, FAC ¶ 182, 222). Thus, based on the pleadings in this case, Plaintiffs have failed to allege that government conduct caused the taking of their property.

**B.      Procedural Due Process (Count II) & *Monell*: Procedural Due Process (Count VI)**

In Count II, Plaintiffs assert a procedural due process claim against all Defendants based on Defendants' taking of an easement across Plaintiffs' property without notice and opportunity to be heard. Additionally, in Count VI, Plaintiffs assert a *Monell* due process claim based on Defendant Dubois' handling of Plaintiffs' January 2023 complaint. "The Due Process Clause of the Fourteenth Amendment allows Section 1983 claims against the State or its employees for violations of . . . procedural due process rights." [5] *Sherwin Manor Nursing Ctr., Inc. v. McAuliffe*, No. 92 C 6659, 1997 WL 367368, at *3 (N.D. Ill. June 25, 1997) (citing *Zinerman v. Burch*, 494 U.S. 113, 125 (1990)). To plead a procedural due process violation, Plaintiffs must allege (1) a cognizable property interest, (2) a deprivation of that interest, and (3) a denial of due process. *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010). Here, the Land Use Defendants argue that Plaintiffs' due process claims fail because they (1) do not have a protectable interest in the enforcement decisions regarding neighboring landowners, and (2) Plaintiffs had a meaningful opportunity to be heard regarding their complaints.

Regarding Count II, Plaintiffs respond that Defendants misconstrue their claim, which is based on Defendants' taking of their land as an easement—not a challenge to code enforcement

---

[5] Similar to their opposition to Plaintiffs' taking claims, the Shaw Defendants, the BCA Defendants, and the B&W Defendants argue that the due process claims against fail them because they were not acting under color of state law. As discussed, section 1983 does not punish conspiracy alone; an actual denial of a civil right is necessary before a cause of action arises. *Goldschmidt*, 686 F.2d at 585. Because the Court finds that Plaintiffs have not alleged a due process claim, there is no need to consider whether the private defendants were acting under color of state law.

decisions. In other words, Plaintiffs' due process claim rests on the same premise as their takings claim. But for all the reasons discussed *supra*, this argument is a nonstarter since the Land Use Defendants did not engage in any conduct that caused a taking of Plaintiffs' property; therefore, Plaintiffs were not entitled to a pre-deprivation hearing.

As to Count VI, Plaintiffs contend that they have stated a claim because the Department "initiate[d] a *faux* investigation to manufacture a bogus report." (Resp. to Land Use Defs.' Mot. at 13). The Court is not persuaded. Indeed, because Plaintiffs do not have a cognizable property interest in the enforcement or investigatory actions that were taken against the Shaws, Count VI and Count II fail to the extent they are based on those actions.

"The basic rights guaranteed by constitutional due process are notice of the intended adverse government action and an opportunity to be heard in response." *Simpson v. Brown Cnty.*, 860 F.3d 1001, 1006 (7th Cir. 2017). "To qualify as a constitutionally protected property interest, the right must be created by 'existing rules or understandings that stem from an independent source such as state law.'" *Tri-State Disposal, Inc. v. Vill. of Riverdale*, 369 F. Supp. 3d 866, 876 (N.D. Ill. 2019). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Furthermore, "the Seventh Circuit has strongly suggested that a property owner is not entitled to due process with respect to action not directed at his property." *James v. City of Evanston*, No. 20 C 00551, 2021 WL 4459508, at *13 (N.D. Ill. Sept. 29, 2021) (citing *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 423 (7th Cir. 2010)). Specifically, in *Muscarello,* a property owner alleged that the county's approval of special use permits for the constitution of windmills on adjacent property violated her constitutional rights. 610 F.3d at 418-420. In analyzing the plaintiff's due process claim, the

Seventh Circuit affirmed that the plaintiff did not have a protectable property interest in the lifting of zoning restrictions on another's property. *Id.* at 423.

Here, Plaintiffs' due process claims essentially take issue with the enforcement actions that were taken (or not taken) against the Shaws. For example, Plaintiffs contend that the Department conducted a "faux" investigation and a concocted a "bogus" report in response to their January 2023 complaint. But, as in *Muscarello*, Plaintiffs do not have a protectable interest in actions that were taken against other individuals, even if those decisions may have an effect on their property. *See DeShaney*, 489 U.S. at 195. Accordingly, Plaintiffs' due process claims fail as a matter of law.

### C.   **Clean Water Act (Count III)**

Plaintiffs assert a claim under the CWA against the Shaw Defendants. "To state a claim for a violation of the CWA, [Plaintiffs] must allege that: (1) a person; (2) discharged pollutants; (3) into navigable waters; (4) without a permit from the Corps." *United States v. Petroff Trucking Co., Inc.*, No. 20 C 930, 2021 WL 2435748, at *3 (S.D. Ill. June 15, 2021). Here, Plaintiffs allege that Defendants discharged pollutants "across Plaintiffs' properties, into Forked Creek, a federally protected waters of the United States, and its adjacent wetlands." (FAC ¶ 556). In further support of their theory, Plaintiffs allege that the pollutants originate outside of the PPN property and the Shaw Defendants "made illicit connections to subsurface tiles that transport contaminated groundwater from a nearby industrial/commercial corridor." (*Id*. ¶¶ 557, 558). The Shaw Defendants, however, contend that Plaintiffs' allegations are speculative and fail to allege critical facts, including what is being discharged, who is discharging it, where it is discharged from, and how it makes its way to the Shaw Defendants' property.[6]

_____

[6] The Shaw Defendants also assert that Plaintiffs' claim is not actionable because they were not acting under color of state law. CWA claims are commonly brought against non-public entities, though. *See* 33 U.S.C.§ 1365 (any

The Shaw Defendants rely on *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020) in support of their position. There, the plaintiff alleged that pollutants did not come directly from its facility because the pollutants had to travel through groundwater before reaching the ocean. *Id*. at 179. The Supreme Court held that "the statute requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*. . . . That is, an addition falls within the statutory requirement that it be 'from any point source' when a point source directly deposits pollutants into navigable waters, or when the discharge reaches the same result through roughly similar means." *Id*. at 183-84 (emphasis in original).

In that case, the Supreme Court listed several factors that may be relevant to determining whether there is a actionable discharge, including (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity. *Id*. at 184-85. It also explained that "[w]here a pipe ends a few feet from navigable waters and the pipe emits pollutants that travel those few feet through groundwater (or over the beach), the permitting requirement clearly applies. If the pipe ends 50 miles from navigable waters and the pipe emits pollutants that travel with groundwater, mix with much other material, and end up in navigable waters only many years later, the permitting

---

citizen may commence a civil action "against any person" who is alleged to be in violation of the Act.). Thus, the Court does not find this argument convincing.

requirements likely do not apply." *Id*. at 184. The Shaw Defendants contend that this case is  more like the latter situation.

Notably, the Seventh Circuit and courts in this district have not had a chance to apply *Maui*, but other courts outside of this circuit have. For example, in *Conservation L. Found., Inc. v. Town of Barnstable, Mass.*, 615 F. Supp. 3d 14, 20 (D. Mass. 2022), the district court concluded that the county's effluent release did not constitute the functional equivalent of a direct discharge because the time it took for the pollutant to travel from the source to the watershed system was 21 years.

Here, Plaintiffs allege that the pollutants originate from outside of the PPN property, but they do not allege what pollutants are being discharged, where the pollutants are being discharged from, or how long it takes them to travel to Forked Creek. While Plaintiffs are not required to allege every detail in support of their claim, to avoid dismissal, they must put forth sufficient facts to state a "plausible" claim to relief. *Ashcroft,* 556 U.S. at 678. Without critical information about the alleged discharge, including the alleged source, this Court cannot determine whether the conduct Plaintiffs complain of is actionable under the CWA.

Additionally, the Shaw Defendants argue that Plaintiffs claims are barred by *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 684 (2023). There, the Supreme Court held that "the CWA extends to only those 'wetlands with a continuous surface connection to bodies that are waters of the United States in their own right,' so that they are 'indistinguishable' from those waters." The Shaw Defendants contend that Plaintiffs' allegations do not address whether the Tuscan Hills wetland is indistinguishable from Forked Creek under *Sackett*. Plaintiffs, however, argue that whether the Tuscan Hills wetland is a water of the United States is irrelevant because the FAC is replete with allegations that the Shaw Defendants discharged pollutants directly into Forked Creek. Furthermore, Plaintiffs point to their allegation that the Army Corps of Engineer made a

jurisdictional determination in 2003 that Forked Creek and the adjacent wetland were waters of the United States. Based on these allegations, the Court agrees that Plaintiffs have sufficiently alleged that Forked Creek and the Tuscan Hills Wetland are Waters of the United States. However, as discussed, the FAC is devoid of facts that would allow the Court to determine whether the alleged discharge is a direct discharge that is actionable under the statute. Accordingly, Plaintiffs have failed to state a claim under the CWA.

### D. *Monell* – Equal Protection (Count IV)

Plaintiffs bring a *Monell* claim against the Department for violation of the equal protection clause. To state a *Monell* claim, Plaintiffs are required to plead factual content that allows the Court to draw the reasonable inference that the County maintained a policy, custom, or practice of intentional discrimination against a class of persons to which Plaintiffs belonged. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011). Here, Plaintiffs allege that the Department "has a policy, custom, or practice of ignoring code enforcement violations for political or pecuniary reasons, of failing to enforce the stormwater and wetlands codes when it is inconvenient for politically connected violators, and of selectively enforcing or ignoring such code enforcement violations . . . ." (FAC ¶ 564). The Land Use Defendants argue that Plaintiff's claim fails because (1) the alleged reason for differential treatment was political favoritism, which is not an actionable basis, and (2) there were rational reasons for each of the Department's decisions. The Court agrees with the Land Use Defendants.

"The Equal Protection Clause prohibits state action that discriminates on the basis of membership in a protected class or . . . that irrationally targets an individual for discriminatory treatment as a so-called "class of one."" *Storey v. City of Alton, Ill.*, 710 F. App'x 706, 708 (7th Cir. 2018). Political favoritism is not a protected class; thus, contrary to Plaintiffs' assertion, the

only way that they can allege an equal protection claim is based on the class-of-one theory. *See Tuffendsam v. Dearborn Cnty. Bd. of Health*, 385 F.3d 1124, 1127-28 (7th Cir. 2004) ("[S]elective enforcement of the laws is not actionable as a violation of equal protection unless the selection is based on an invidious criterion such as race[.]"); *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) ("Since Plaintiffs do not allege that they are members of a protected class, they must proceed under a 'class-of-one' theory.")

To establish a successful class-of-one equal protection claim, Plaintiffs must show that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id*. It is not enough for a complaint to suggest an improper motive, for a given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity. *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015). "Thus, even at the pleadings stage, all it takes to defeat a class-of-one claim is a *conceivable* rational basis for the difference in treatment." *Id*. (internal quotations omitted). "For that reason, it is possible for plaintiffs to plead themselves out of court if their complaint reveals a potential rational basis for the actions of local officials." *Id*. "Put differently, if the Court can come up with a rational basis for the challenged action, that will be the end of the matter." *Id*.

Plaintiffs contend that an equal protection violation is alleged here because, on one hand, the Department aggressively enforced stormwater and wetland code violations against another neighbor, Denis Sullivan, but ignored more egregious violations by the Shaw Defendants. However, Defendants have pointed to allegations in Plaintiffs' FAC which demonstrate that there was a rational basis for the Department's decisions. For example, regarding the October 2019 violation, Ratajczak's log states that "surface runoff from the broken tile is draining into the pond."

(FAC ¶ 187). In response, the Shaw Defendants were ordered to fix the broken tile. (*Id.* ¶ 188). Likewise, it was rational for the Department to conclude that it would not be able to carry its burden of proof in an enforcement action concerning the 2021 complaint because the Shaws hired a professional engineer who concluded that PPN's drainage system was consistent with standard practices in Illinois and the Illinois Drainage Code. (*Id.* ¶ 293). While Plaintiffs assert that the report was false, they concede that the Department's engineering staff reviewed the report and found no reason to disagree with the findings. (*Id*. ¶¶ 340-343). Because Defendants have provided a rational basis for each of their decisions—which the FAC also acknowledges—Plaintiffs have not stated an equal protection claim.

### E. *Monell* – Ratification/Delegation of Authority (Count V)

Plaintiffs also assert a *Monell* claim against the Department based on Defendant Mack's alleged decision to delegate authority for investigating code enforcement violations to BCA. "[A] plaintiff seeking to establish a § 1983 claim against a municipality based on a 'ratification' theory must allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). Here, the Land Use Defendants argue that Plaintiffs' claim fails because Mack was not a final policymaker. In response, Plaintiffs contend that Mack was the final policymaker with regard to the "internal procedural matters." (Resp. to Land Use Defs.' Mot. at 13).

Whether a person has final policymaking authority is a question of state or local law. *LaBella Winnetka, Inc. v. Vill. of Winnetka*, No. 07 C 6633, 2008 WL 696902, at *6 (N.D. Ill. Mar. 13, 2008). The authority to implement pre-existing rules does not constitute final policymaking authority. *Id.* As highlighted by the Department, the County's ordinances expressly provide that the county board is authorized to determine policy and officials, like Mack, are authorized to

administer ordinances. Plaintiffs have not identified any state or local law that establishes Mack was a final policymaker regarding internal procedural matters. Without that, Plaintiffs have failed to sufficiently allege that Mack is a final policymaker, and their *Monell* claim based on delegation of authority fails.

### F.     <u>State Law Claims (Counts VII – XVIII)</u>

Plaintiffs raise a variety of state law claims. Defendants argue that because each of Plaintiffs' federal claims fail as a matter of law, the Court should decline to exercise supplemental jurisdiction over the state law claims. Given that Plaintiffs are being granted leave to file an amended complaint, the Court declines to determine if the state law claims should be dismissed without prejudice to renewal in an appropriate forum. *See Schmalz v. Vill. of N. Riverside,* No. 21 C 1684, 2023 WL 2752731, at *4 (N.D. Ill. Mar. 31, 2023) ("Given the authorization to file an amended complaint, there is no reason to address whether relinquishment would be proper if the federal claim is dismissed[.]"); *Anchorbank v. Hofer*, No. 09 C 610, 2010 WL 842172, at *8 (W.D. Wis. Mar. 5, 2010) ("It would be improvident to determine the fate of plaintiffs' state law claims before determining the fate of their federal claims."). Thus, the Court will defer ruling until the viability of Plaintiffs' federal claims is resolved.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' motions to dismiss are granted and Plaintiffs' First Amended Complaint is dismissed without prejudice. Plaintiffs are granted leave to file an amended complaint consistent with this opinion by 12/30/24.[7]

**DATED**: November 26, 2024                 **ENTERED**:

*LaShonda A. Hunt*

_____

LASHONDA A. HUNT
United States District Judge

---

[7] The Court notes that while Plaintiffs' 691-paragraph, 115-page FAC fails to allege many of the critical details required to state a claim, it also contains a host of unnecessary facts and details. The Court cautions Plaintiffs that any amended complaint should "contain . . . a *short and plain statement* of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2) (emphasis added); *see also* Fed. R. Civ. P. 8(d)(1) ("Each allegation must be simple, concise, and direct.").